THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. WILLIAM BUTLER, EUGENE WILLIAMS AND BLAND
WILLIAMS, DEFENDANTS-APPELLANTS.

Argued June 2, 1958—Decided June 27, 1958.

562

564

*Mr. William D. Danberry,* Assistant Prosecutor, argued the cause for respondent (*Mr. Warren W. Wilentz,* Middlesex County Prosecutor, attorney).

*Mr. Alfred D. Antonio* argued the cause for appellant William Butler (*Mr. Sam Weiss,* on the brief).

*Mr. Russell Fleming* argued the cause for appellants Eugene Williams and Bland Williams (*Mr. Irving W. Rubin,* attorney).

The opinion of the court was delivered by
FRANCIS, J. The defendants, William Butler, Eugene Williams and Bland Williams, the latter two being brothers, were separately indicted for the murder of James Quackenbush. Two other persons were also indicted, James Winbush, who was later committed as insane and did not stand trial, and John Coleman, who testified for the State. Butler and the Williams brothers were tried together, convicted of murder in the first degree, and sentenced to death. Their appeal is before us under *R. R.* 1:2–1(*c*). The separate indictment against Coleman was not joined with the others for trial.

The trial was a long one. It began on March 18 and ended on April 12, 1957. The many problems presented on this

appeal can be best understood by a general outline of the evidence adduced by the respective parties.

During the early morning hours of July 20, 1956 a fire broke out on the premises of the Koppers Coke Company in Port Reading, Middlesex County, New Jersey. Two patrolling police officers in the neighboring Borough of Carteret noticed the blaze at about 2 A. M., and drove over to investigate it. When they arrived they found a burning Buick automobile, which was parked in the alleyway between the office and the "foam house" of the Koppers Company. While they were looking around, the officers discovered an outstretched corpse, head and upper chest soaked with blood, lying near a fire hydrant located about 92 feet from the office building. A ravelled fire hose was attached to the hydrant, and near the body lay a pack of cigarettes, two overturned drums, and the handle of a hammer. A fire alarm was turned in and the Woodbridge Police and the coroner were contacted.

An inspection of the area disclosed that the office safe was lying on its back against the side of the office building, directly below a window whose screen had been ripped to permit access to the office. The safe was on fire, and there was debris lying on the ground nearby. The police inspected the interior of the office and found marks indicating that the safe had been dragged across the floor out the rear door and then had been dragged or thrown down the back steps. In the office, drawers and lockers had been rifled and two electric razors belonging to company personnel were missing. Though the premises had been ransacked, no fingerprints were found except one "latent" print on a venetian blind which was later shown to be that of the office janitor. The dead man outside could not then be identified; his trouser pockets had been turned inside out and were empty. A hammer head and a man's cap were also found in the vicinity.

Subsequently, the deceased was identified as James Quackenbush, a 60-year-old "relief engineer" in the employ of the Koppers Coke Company. His job was to "keep steam up and keep the material steam during the course of his tour

of duty." The county medical examiner found the cause of his death to be a cerebral hemorrhage; before receiving the blows that fractured his skull, he had suffered 14 or 15 major body wounds, including nine open lacerations. The time of death was established at between 2 A. M. and 3 A. M., July 20.

Captain Krysko of the Woodbridge Police Department was assigned to conduct a preliminary investigation of the crime. He followed down several leads, all of which were fruitless. Then, on July 29, 1956, at about 1:30 A. M., he received a telephone call from a friend, a private detective named Farrell, who told him that he had information. Immediately after calling, Farrell came to Krysko's home, accompanied by one John "Pee Wee" Coleman, a Koppers employee. The three men talked for two hours; thereafter, Coleman voluntarily accompanied Krysko to police headquarters and made a statement. In the statement Coleman did not directly implicate himself in the crime but said that Willie Butler, a fellow worker at Koppers, had at various times asked him to assist in robbing a gas station, a bar, and "a few places in New Brunswick and Perth Amboy"; that Butler had also asked Coleman to help him to steal a safe from the Koppers office when he, Butler, returned from a vacation to Tennessee; that Butler had gone to Tennessee with two companions for about nine days, and had then returned and resumed working at Koppers; that Butler had "cased" the office and had made plans to rob it at about 2 A. M. some morning by going through a rear window, carrying the safe outside, and blowing it with an explosive which he intended to procure; that he told Coleman these plans, but Coleman "wouldn't go for that kind of stuff." The statement also mentioned "two strangers that Willie was hanging around with"; Coleman did not know them, but they had once given him a ride in a 1949 green Studebaker; the two strangers "also have" a 1950 Mercury, and their brother owned a 1956 Oldsmobile. Coleman's statement concluded with Captain Krysko asking if there was "anything else that you can tell me that might help?" to which Coleman replied, "No, that's about all."

The police finished taking Coleman's statement at 5:15 A. M. In both his two-hour conversation with Krysko and his statement, Coleman implicated no one except Butler. Detective Farrell's interest in the matter may have been motivated by the fact that the Koppers Company had offered a $1,000 reward for information leading to the conviction of the killers.

On the following day, July 30, Butler was arrested as a material witness. He maintained complete innocence of having had anything to do with the crime. His fingerprints were compared with the one print found at the scene of the crime but did not match. Coleman, who was also held as a material witness, was placed on $1,000 bail and released, but he was picked up again a day later. Butler's bail was set as $50,000.

On August 16 or 17, 1956 Coleman, while in custody, implicated the Williams brothers for the first time. They were later arrested and denied all guilt. Subsequently, Coleman also told the police that James Winbush had been a participant, and he was apprehended. After the arrest of the Williams brothers a 1949 green Buick automobile registered in the name of Clarence Williams, another brother, was taken by the police from a parking garage. It was minutely examined by an expert toxologist, who later testified that samples of soil taken from the Koppers property matched specimens taken from the floorboards of the car. However, it was further established that the automobile was very dirty and had not been cleaned in some time. When the police impounded it, the car contained some clothing, tools, a knife, a flashlight, and other articles. These were examined, and none of them could be connected with the crime. In fact, except for the soil specimens, there was no other tangible demonstrative evidence linking any of the defendants with the charge against them. After Butler's arrest all of his clothing and shoes had been taken from his room for testing and although "quite a volume" of blood was found to be soaked into one pair of shoes, the blood was "dispersed" and there was not enough to get a type reaction and to match it up against the victim's blood type; and there was

no way of telling how long the blood had been on the shoes. There was also a tiny speck of blood at the bottom of a pair of trousers belonging to Coleman, but this was not enough for a test. Otherwise, no loot was found in defendants' possession, and there were no fingerprints, or anything else, to establish them as the criminals. There was no direct physical evidence against them except the soil specimens.

As has been noted, the trial of the three defendants commenced on March 18, 1957. From August 24, 1956, when Coleman was transferred to the Middlesex County jail, until after he had finished testifying at the trial, he was often visited by the police, the prosecutor's men, and county detectives in his cell. A certified Visitor List, reproduced in the appendix, shows that these officers spent a great deal of time with him. Coleman himself, although he emphatically denied at the trial that his testimony was founded on fear or favor, admitted that over a period of approximately seven months, policemen and detectives had visited him at three-day intervals in groups of three or four. He also admitted that he used to lie down and scream during these sessions, but denied that he had been beaten, attributing his agonies to the intellectual efforts involved ("it was hard to tell"). He said that he had been taken to the scene of the crime twice by the police. At first he denied having been shown any maps or photographs, but later stated that he had gone over a map with the prosecutor. He said that in the county jail he had told other inmates that the police had beaten him, but that this was only to shut them up, as it was none of their business and he did not like them asking questions. He accounted for marks observed on his head and body while he was in jail by testifying that, at the suggestion of other prisoners and with their help, he had embarked on a course of self-injury so that he could come into court beaten up, say the police did it, and sue them for $100,000. But he was talked out of this by a preacher who came to see him. Detective Panconi of the Woodbridge Police, who was in charge of the investigation, testified that he personally visited Coleman in his cell eight or nine times, including two occas-

sions while Coleman was testifying. Panconi said that on August 27, 1956 he and other officers spent "practically all day" with Coleman. The police denied that Coleman had been threatened, beaten or promised anything.

During the investigation a question arose as to Coleman's mental competency. The Woodbridge police chief sent a letter to the Crownsville State Hospital in Baltimore, Maryland, and received this reply:

"Dear Sir:

Mr. Coleman was admitted to Crownsville on July 9, 1954 upon certification of Doctors Carl P. Restling and Louis C. Garis of Baltimore. The patient was given a mental status examination on July 27, 1954, and was given a diagnosis of: Chronic Brain Syndrome associated with Convulsive Disorder, with Behavior Reaction.

Psychological examinations performed on August 5, 1954 revealed that 'Mr. Coleman was functioning within a moderate defective range of intelligence, that he is an anxious and insecure individual who tries to avoid all difficult life situations, that when confronted with unavoidable difficulties he may try to bluff through them or become panic striken and respond with a gross emotional outburst resembling a temper tantrum.' There was no evidence on the test that Mr. Coleman was psychotic.

Mr. Coleman was released from the hospital on September 5, 1954, at which time, it was felt that he was not psychotic. He was seen at our Out-Patient Clinic by Dr. Arthur Mandel, on September 27, 1954. Dr. Mandel gave the diagnosis of Mental Deficiency of a Moderate Degree, Without Psychosis.

We hope that this information will be of some help to you.

Very truly yours,

RALPH H. MENG

Ralph H. Meng, M.D.
Superintendent."

At the trial the State's case depended almost entirely on Coleman's testimony. The prosecutor established the physical circumstances attending the homicide, and then called Coleman to the stand. His testimony was as follows:

He is 25 years of age, was born in East Spencer, North Carolina, and had no schooling after the first grade. When he was eight years old he moved to Maryland, and thereafter

lived in Pennsylvania and New York. He moved to Carteret, New Jersey, on March 6, 1956. He is married; his wife is in Maryland, and he had not communicated with her after his arrest. They had one child, which died. When Coleman came to Carteret he got a job at a fertilizer factory, where he met and worked with Butler. They became friendly during the next few months, seeing each other both at work and socially during the evenings. Coleman also met the Williams brothers in March 1956.

He was laid off from his job on May 17, 1956. He got another job, which lasted for only two weeks, and then went to work for the Koppers Coke Company, where he was re-united with Butler. The two worked together, unloading crossties and cleaning up the yard. One day Butler was told to work inside the office. He did so, and when he returned to the yard he told Coleman that he had been moving desks and had stolen some keys from a drawer. He said that he was going to come out to the office some night and see if the keys would fit any of the office doors. According to Coleman, Butler said that he "believed $3,000 was in the safe and he want me to help him to pull that job." Subsequently, Butler said he was going on a "vacation" to Tennessee, and that he had arranged to send himself a telegram giving an excuse that he could show his boss. He went away for two weeks and returned and went back to work.

On July 19, 1956, Coleman, who now worked the 12 noon-9 P. M. shift, went to the plant shortly before noon. When he arrived, he met Butler, who asked him "would I help him to pull the job." Coleman refused. At 9 P. M., after his working day was over, he cleaned up and went home. Then he went to the Little Cotton Club, a tavern on the corner of Salem Avenue and Sussex Street in Carteret, which he, the Williams brothers, and Butler frequented. He arrived at about 9:45 P. M. and met Butler; they sat together at the bar. Butler again asked him to help with the theft, and again he refused. Butler got up and left him, going over to talk to a man known to Coleman as "Bill Red." After a few minutes Butler rejoined Coleman and threatened to

"do him in" if he would not help with the theft. Coleman took this to be a threat on his life and became frightened. He got up and walked out of the tavern; Butler followed him and continued his urgings, which Coleman kept resisting. Then Coleman went back into the tavern, with Butler following; Coleman sat at the front of the bar, while Butler went to the back.

Coleman first saw the Williams brothers in the tavern at 11 or 11:30 p. m., with James Winbush. Butler went over and talked to them for a while, and then walked over to Coleman and again solicited his aid with the theft. Coleman refused and once more left the tavern. Butler, the Williams brothers, and (apparently) Winbush followed him out, and Bland Williams pulled a yellow-handled switchblade knife on him. He was told that he had to come with them or he would be killed. (At this point in Coleman's testimony he identified a knife as the one pulled by Bland Williams, and it was received into evidence. He said that the identifying feature was a red spot on the handle of the knife; he had first identified it before trial when the police showed it to him. Although Williams was holding it by the handle when he threatened Coleman, he kept tossing it in the air, which is how Coleman noticed the red spot.) They made him walk to a 1949 green Buick (which he identified from pictures at the trial, and which he had inspected and been inside when the police showed it to him before the trial), and forced him inside, into the front seat between the Williams brothers. He could not get away because Bland Williams had his knife in a position of use at all times. He recognized the Buick because he had ridden in it once before with the Williamses in June 1956, when they went to see some girls.

The party drove off with Bland Williams at the wheel (although he was the person with the knife), Coleman next to him, and Eugene Williams on the other side. Willie Butler and James Winbush were in the back seat. Enroute to Koppers, the car was stopped and Butler got out. Coleman did not know where he went, but he was back in five

minutes. Then they drove off again, and Bland Williams stopped the car in the neighborhood of Koppers while Butler, the leader, gave each man his assignment. He designated Coleman as lookout, and told Winbush to keep him covered. Then they drove up to the loading platform near the Koppers office, and all five men got out of the car. Here is Coleman's verbatim description of the theft and the killing:

"Q. You drove where? A. He gives to all of us the order what to do—Butler did—and he tells me what I must do and he told the other guy to keep me covered, he told Bland and Eugene what they have to do.

Q. I think you said you drove somewhere. A. Well, the car pulled off and he drove into the platform.

Q. After you drove to the platform, what happened next? A. Well, they go out there.

·Q. Then what did you do? A. Then Willie gets out, the driver gets out, Bland, myself and Eugene and Winbush gets out and goes on the left-hand side of the back. That is where to take, where he is going to take the window from the back.

Q. I am sorry. After you got out of the car, where did you go? I couldn't hear you. A. We got out of the car and went to the office.

Q. To what office? A. To the office at the tie yard.

Q. The office at the tie yard? A. Right.

Q. After you got to the office at the tie yard, what happened? A. Well, after we got to the office of the tie yard, I walked up to a telegraph post—me and Winbush, he was beside me—and Willie, he walks up to the first window, him and Bland and Eugene.

Q. Yes. A. And he ripped the screen loose down the bottom of the window and he couldn't get in that way, he tried a second window and he couldn't get in that window.

Q. Then what happened? A. Well, he took a pair of wire clips, clips and started to cut the screen. I could hear him clipping when he was cutting.

Q. All right. Then what happened? A. He took his screw driver out of his pocket, put it on the bottom of the window and tried to push up on it, but it was latched.

Q. Then what did he do? A. Well, Bland he gave him a lift.

Q. What was that? A. Bland gave him a lift to the top of the window. He couldn't reach the top of the window. He took a screw driver and turned the latch to the top of the window, and then he let him down and take his screw driver and put it underneath the window and pulls it up like and goes in.

Q. Who went in? A. Willie Butler went in.

Q. How did Willie get into the window? A. Well, Bland give him a lift into the window.

Q. Bland gave him a lift? A. Bland and Eugene.

Q. Did anybody else go in the window? A. Just three.

Q. Who went into the window? A. Butler, Eugene and Bland.

Q. How did Bland get into the window? A. Well, his brother gave him a lift and Butler pulled him.

Q. How did Eugene get into the window? A. Willie gave him a lift into the window.

Q. Where were you standing when they went into the window? A. Well, Butler told me and Winbush to move up. We walked up.

Q. How close were you standing to the window? A. It was about 10 feet I reckon, I am not positive.

Q. After they got inside the building, what did they do? A. After they got inside the building, it is drawers and chairs was moving and making lots of noise, drawers were slamming and opening. I can hear it from the outside.

Q. Did you hear anything being said by anyone in there? A. Butler said, 'Hurry up, we will do this job quick.'

Q. Did you hear any other noises? A. Well, I heard him fooling with the safe. He say, 'The safe over there,' and I heard him messing with that.

Q. Who said, 'The safe over there'? A. Butler said the safe was over there.

Q. Did you hear any other noises? A. Yes, they was arguing in there.

Q. Who was arguing? A. Butler was arguing with the two, Bland and Eugene. He said they weren't working fast enough.

Q. Did Butler say anything else? A. That's all I heard him say.

Q. Did Bland say anything? A. I heard them talking, but they was talking in such a low voice I couldn't hear him too good. They was talking low.

Q. Did you hear anything else? A. Well, I heard something heavy jarring on the floor back and forth. That was the safe.

Q. After you heard that, what happened? A. After I heard that, I heard a dog bark.

Q. Yes. What happened next? A. Next I heard the night watchman holler and say, 'Who is that?'.

Q. When the night watchman hollered, 'Who is there?', what did Willie do? A. Willie, he went out the back door.

Q. What did Bland and Eugene Williams do? A. Bland went out the back door too.

Q. The back door of what? A. The back door of the office.

Q. Could you see where the watchman was coming from? A. Yes, I could see.

Q. Could you see where he was headed? A. He was headed from the—he was coming from the boiler room to the office.

Q. All right. Willie went out one door and Bland and Eugene went out another door. A. They went out the same door.

Q. They went out the same door. A. Yes.

Q. Now tell the Court and jury exactly what you saw when they went out. A. Well, when Bland come out the door, Eugene—

they grabbed Mr. Quackenbush; they gets around him, tried to trip him up, tried to throw him down, but they couldn't throw him down; and Mr. Quackenbush, he was hitting back; they was hitting him with hard punches, it looked like to me was hurting Mr. Quackenbush; he was giving in; I see him weaken; Butler walks around Mr. Quackenbush; Mr. Quackenbush couldn't see him; he walks around on the left hand side, even with the door, and comes around and he takes that club right there and he catch him on the left side.

Q. What did Mr. Quackenbush do then? A. After he was hit, this blow took him down; he went down to his knees, but he kept fighting gamely, and he kept hitting him.

Q. Who kept hitting him? A. Butler kept hitting him.

Q. With what? A. With that stick. And I heard something pound—you know, it goes like that—I heard—I don't know what it was, and—

Q. What did Mr. Quackenbush do then? A. He fell. I should say he fell to the ground; about the second blow take him to the ground, and he just kept beating on him.

Q. Who kept beating on him? A. Butler kept beating on him. I say, 'Stop, don't hit him no more.'

And he say, 'What you got to do with it? You don't have nothing to say.'

So I took it easy.

Q. Did Mr. Quackenbush say anything? A. Yes. He kept beating on Mr. Quackenbush. He was throwing up his hands.

Q. Who was throwing up his hands? A. Mr. Quackenbush was throwing up his hands, trying to block the blows of the stick. He say, 'You are hurting me.'

Willie say, 'Damn it, you might recognize me; I mean to kill you.'

Q. Did Mr. Quackenbush say anything else? A. No, he didn't say nothing then.

Q. While Willie was hitting Mr. Quackenbush with this stick— A. Yes.

Q. What were Bland and Eugene Williams doing? A. While he was beating on him with the stick, they was kicking him too, and then the guy aside me, he walks over, he gets into it, and I am standing up there looking at it; I don't know what to do; I don't know whether to run or stay, cause I didn't know whether they had a gun or not.

Q. When Willie stopped striking Mr. Quackenbush with that stick, what did Willie do next? A. He say, 'Damn,' he say, 'We done him in,' he say, 'This here hard job, I am awful sweaty and tired.'

Q. Did Willie touch Mr. Quackenbush— A. Yes.

Q. —— after he said that? A. Yes.

Q. What did he do when he touched him? A. What he do after he touch him? He turned his pockets wrong side out, went all the way through his pockets—Bland, Eugene and Willie and Winbush.

Q. What happened after that, John? A. Well, what happened after that? The night watchman didn't move no more. I kept looking at him and he didn't move; he was laying with his hands down; he was lying on the flat of his back with his hands down, and I kept watching him. And Willie say, 'You are nervous.'

And I say, 'Yes, I am nervous.'

He say, 'You need a drink.'

I say, 'I don't need no drink.' I say I didn't need no drink.

Q. What did Willie do next? A. Well, they went back to the safe.

. Q. What did they do with the safe? A. They bring it out the back door, out on the porch, bring it out the left hand side door on the left hand side of the office.

Q. John, you said, 'They bring it out the back door.' Whom do you mean by they? A. Willie, Bland and Eugene.

Q. All right. Go ahead. Continue with your— A. When they was coming down off the steps with the safe, the step broke, or something happened; I could hear it crack, and they brought it down. They was beating on it, bamming on it with a sledge hammer. They was beating on it with a sledge hammer, trying to get it open. They say, 'We will have to make a hole big enough for this'—I can't tell the name of this—'listerine.' He say, 'If I can make a little hole for the listerine, I could put the tube in there.'

Q. Who said that? A. That is what Butler said. It was about an inch long and about this big around, and he takes that and put something down in between two bolts and he lights it, and then the explosion. It went off and started things on fire all around in that area of the office, and that is when I run off. I tripped myself up when I went to go over the ditch, and I couldn't make it all the way over to the ditch, and I fell on the other side.

Q. John, when the explosion occurred— A. Right.

Q. —— what did Willie, Bland and Eugene Williams do? A. Well, they was trying to fight that fire; I was running, looking back.

Q. How were they trying to fight the fire? A. They was running around in circles, it looked like to me, because I was moving out and I didn't stay until it was all over."

Coleman testified that Butler and the Williams brothers had worn white gloves when they entered the office, and that after the killing but before the safe was blown, Butler had moved Quackenbush's car, which was parked in the yard, into the alley between the office and the "foam house."

This concluded the direct examination. Coleman was then exposed to exhaustive cross examination by the three defense attorneys which developed these further facts:

Coleman stated that he was in a Maryland insane asylum for about three months and then was released and treated

at the clinic as an outpatient. He could not remember how long his treatment lasted. He knew that he was under indictment for murder but did not know whether he was then under arrest. On the day before he took the stand, he spent some time with the prosecutor. He said that he had made no deals with the prosecutor's office and gave his motive for testifying thus:

> "I ain't expecting to get no break. When I see a man, a murder in cold blood, an old man murdered in cold blood, someone have got to go out there and take his life, you know, the man want to live like you, he want to live like me, he want to live like other people. And if I wouldn't tell it, God would hold that against me, God looking down on you, me and all and I wouldn't want to go tell no lie to shield some other murder. * * * On God's bible I ain't tell no lies."

His testimony was replete with lofty religious sentiments, e. g., "Truth is the light of the world." He admitted that despite his thirst for truth, he had originally implicated only Butler in the crime, and had stated that he knew no more about it until after he had talked to his attorney. Only then did he bring in the Williams brothers and Winbush (and himself). But he explained that he did not originally tell the "whole truth" because he was afraid of the defendants and "hadn't made up his mind." According to him, the crime weighed heavily on his mind and he felt an urge to tell someone about it, but could not decide to do so. Then one night (it must have been July 29, 1956) he went to the Little Cotton Club and met James Farrell, a private detective. He had known Farrell before the crime was committed because Farrell used to come to the club and buy Coleman (and others) beer, and Coleman remembered him as a "nice man." On this occasion Farrell represented to Coleman that he was the dead man's nephew and that he was looking for information. Coleman told him that Butler had done it; he testified that Farrell had not really induced him to tell this and to come to the police with him but that he, Coleman, had wanted to tell and eventually would have told anyhow. He said that his reason for naming only Butler in his

original statement was that he thought that Butler was then in jail, and could not hurt him, while he knew that the Williamses and Winbush were free to come after him.

Coleman elaborated on his direct testimony as follows: He had been forced to enter the car at about 11:35 P. M., and from then on he was in Butler's company until about 1 A. M. He had been brought along on the "job" because he knew what they were going to do, and could have gone to the police. Coleman reiterated his testimony that the men had worn white gloves (silk); later he testified that the gloves had a blue border, and still later that they were thick work gloves. And he said that Butler had worn the thick gloves while working with the fuse and wires in blowing the safe. He emphatically repeated that the safe was blown, not ripped, and that Butler had told him two weeks before that he was going to get some "listerine", *i. e.,* nitroglycerin. The blast had been very loud and had lit up the whole area. He could not describe the clothes worn by any of the defendants, not even whether they wore light or dark shirts.

Coleman admitted that while he was in the county jail he had told other inmates that the police had beaten him, but said that he had been lying. He also admitted having told them that he had shot a man to death in New York, and that this was a lie. He said that Butler had sent him a threatening note while he was in jail; the note was thrown away.

Asked about his abilities, he said that he is unable to add or read, but can "spell words," can write his name only, and can tell time "a little bit." He had epileptic fits when he was eight or nine, but has outgrown them. Throughout his testimony he insisted upon his own innocence of any criminality, maintaining that his presence at the scene and any apparent participation in the homicide were involuntary and under the coercion described. However, at the oral argument we were informed that two months after the convictions of Butler and the Williams brothers he pleaded *non vult* to murder in the second degree and was given an indeterminate sentence to the New Jersey Reformatory at Bordentown.

After Coleman testified the State called other witnesses to provide some corroboration for his story. Dr. Brady, the State's expert toxologist, testified that an analysis of the safe disclosed "material that would indicate the residual of an explosion." Police Lieutenant MacKinnon, who had examined the safe, said that in his opinion it had been blown, not ripped. An eyewitness to the fire, who saw it about 2 A. M. on July 20, testified that he had heard a slight explosion "like a light bulb," but that it did not occur until after he had seen the fire in full blaze. This witness had previously testified that when he saw the fire, he also saw something in the dark which looked like a figure trying to extinguish the flames.

William Ervin, the "Bill Red" whom Coleman had mentioned, said that he had seen Butler and Coleman together in the Little Cotton Club at 9 P. M. on July 19. Ervin had been watching television and had not been paying much attention, but he testified that Butler had come over and talked to him, and that he had seen Butler and Coleman leave the tavern together and then come back in. Ervin said that he had not seen the Williams brothers in the tavern that night, although he had seen them in a pool hall earlier in the evening.

Another State's witness testified that on July 19 he had been at the club from 5:30 to 9:30 P. M. and had not seen Butler at all, but that he had seen Coleman there at 8 P. M. He said that he had seen the Williams brothers outside the tavern at about 9:30 P. M.

One of the bartenders who had been on duty at the tavern between 6 P. M. until 2 A. M. on July 19 testified that he "couldn't say" that he had seen any of the principals in the club that night.

Aron Beason, testifying for the State, corroborated Coleman's story that Butler had taken a two-week "vacation" with the aid of a false telegram prior to the crime. Beason testified that he had gone to Tennessee with Butler from June 29 to July 17, 1956.

Mr. Chomyak, the personnel manager at Koppers, testified that on June 15, 1956 Butler and others had been brought into the office to move furniture, and that when they had finished, a key to the back door was missing; all of those who had worked in the office, including Butler, denied having taken it.

The State put Butler's two roommates, who had also been subpoenaed by Butler's attorney, on the stand. One of them, Marvin Huston, testified that he had gone to bed at about 9:30 P. M. on July 19, 1956, and that Butler had not yet come home. Huston could not say what time Butler came in; he awakened momentarily when Butler got home, and he thought that it was then a little before 4 A. M., the time when Buster Staples, the other roommate, had to get up to go to work. But he was not at all sure. Staples testified that he had retired shortly before 8 P. M. on July 19 and had awakened at 4 A. M. the next morning. He said that when he looked at the bed in which Huston and Butler usually slept together, he could not tell whether one or two men were huddled under the covers because the room was half dark.

Detective Panconi, testifying for the State, said that in August 1956 Coleman had told him that when the explosion of the safe occurred, he had dropped his hat in the vicinity of the Koppers office and had not recovered it. The police searched the area unsuccessfully, and later found the hat in Coleman's room. Finally, Victor Beatty, an experienced criminal who is serving a two to three-year sentence for a prison break, testified that while he was talking from cell to cell with Butler in the county jail in August 1956, Butler had told him that he had committed the homicide. Beatty said that he had not been promised any favors for testifying; he also indicated that he was well aware of the prison code and sanctions imposed on informers.

This ended the State's direct case during which the most substantial evidence against the defendants was:

1. The testimony of Coleman,
2. the testimony of Beatty, and

3. the testimony of the toxologist that the soil specimens taken from the Williams car matched specimens taken from the crime area.

The case for the defendants was substantially as follows:

Five inmates of the Middlesex County jail presented a composite picture of Coleman's behavior there. Each of them testified that Coleman had told him that he had been beaten by the police and was being forced to tell lies about Butler and the Williamses. One man testified that Coleman had said that he had been beaten so badly that his shirt was bloody. There was also testimony that Coleman had stated that he had been offered $1,000 to lie. The inmates testified that Coleman was frightened and distressed. One of the witnesses, a man named Flagger, was in a police lineup from which Coleman identified Eugene Williams. He implied that Williams was the only man in the lineup whom Coleman did not know, and Eugene Williams later testified that he had this impression when Coleman identified him.

The Reverend Tillman, a minister, testified for the defense. He said that he had visited Coleman in jail on December 19, 1956, and again on December 27, and that Coleman told him that he was being forced to lie, *i. e.,* "They beat me and made me say that somebody murdered someone, and they tried to pull me in on it." The minister said Coleman had told him that he knew nothing about the crime.

Attempting to refute Coleman's testimony that the safe had been blown, the defense called Detective O'Bierne of the Newark Police, who had examined the safe when the crime was being investigated. A veteran officer, who had examined about 100 "safe jobs," he testified that in his opinion the safe had been ripped and not blown. And Dr. Barnes, a Rutgers professor and chemistry expert, testified from his expert analysis of specimens taken from the safe that it was "extremely unlikely" that the material had been exposed to explosives.

Another prisoner at the county jail, Cooper, said that Beatty, the convict who had testified for the State as to

Butler's admissions in prison, had told him that he had been offered $1,000 to lie about Butler.

Dr. Tedrow, a soil expert, testified that the dirt sweepings taken from the Buick could not be positively ascertained to be the same soil as the specimens taken from the scene of the crime.

Each of the defendants denied having had anything to do with the crime. Eugene Williams testified in his own behalf as follows:

He is 26 years of age, was born in Florida, and attended school through the 9th grade. He was inducted into the Army in 1951, served in Korea for 11 months and was decorated, and was honorably discharged in 1953. He came to New Jersey with his brothers in 1954, and lived in Perth Amboy.

On July 19, 1956 he was not working. He and his brother Bland went to Sasala's Bar in Perth Amboy that afternoon, and he left Bland there at about 5:30 or 6 P. M. and went home to change his clothes. He left the room where he lived with Bland at about 7:30 P. M. and went to the home of Mildred McCrea, a girl friend. He got to her house at about 8:30 P. M. and brought her back to Sasala's Bar at around 9 P. M. Bland was there. Eugene and Mildred left the bar at about 11:30 P. M. and went to the A Bar in Perth Amboy by taxi. They remained there until about 1:45 A. M.; then Mildred called a taxi, which picked them up. The taxi driver was known to Eugene as "Joe." A "fellow by the name of Roy" asked if he could share the cab part of the way, and they consented. Roy was dropped off first. Eugene and Mildred continued on to Mildred's room, where Eugene spent the night with her. He left her at 6:30 A. M. the next morning.

Eugene testified at first that he had not known Butler, Coleman or Winbush, but later admitted that he knew Coleman by sight. He had never previously been arrested or convicted of a crime. When he was arrested for this crime he was unable to recall where he had been on the evening of July 19. He identified the Buick as Bland's and he

testified that the police had never beaten him when he was in custody.

Eugene's alibi was supported by the testimony of Joseph Ciminieri, Mildred McCrea, and Roy Ellis. Ciminieri testified that in July 1956 he had been employed as a cab driver by the Maxwell Cab Company in Perth Amboy. It was his custom and the company practice to keep records of his calls, and he recorded them personally on cards. The cards would be locked up and only the employers had access to them.

Ciminieri testified that he personally remembered having picked up Eugene, Mildred and a man named Roy Ellis at the A Bar in Perth Amboy at 1:45 A. M. on July 20, 1956. He said he had dropped Ellis first, and then the others. He was able to identify all three of them in court.

Defendants introduced into evidence certain records of the Maxwell Cab Company. The record of Ciminieri's calls for July 19, 1956 shows that he brought a fare from the A Bar to Smith and Rector Streets, as he had testified. The time when he made this run is not indicated but the card shows that it was the fifth trip after 11 P. M., which would probably be early in the morning of July 20. The entries on the card were made in pencil by Ciminieri, but someone had underlined, in ink, the words "A Bar" and "Smith and Rector." Also, the notation "11 P. M.," which would fix the approximate time of his A Bar pickup, had been inserted in ink. Ciminieri testified that he had not thus marked the card. But later Mrs. Maxwell, the co-owner of the cab company who was called as a rebuttal witness by the State, testified that she had marked the card "11 P. M." She was not asked why.

Ciminieri admitted on cross-examination that Mr. Scanzo, a detective hired by the defense, had been to his home and had spoken with him two weeks before he testified.

Roy Ellis, called as a witness, further corroborated Eugene Williams' alibi. He testified that he did not know who Williams was when they shared the cab ride, but that he knew Mildred McCrea and she was there.

Mildred McCrea testified that Eugene had visited her at 8:30 P. M. on July 19, 1956, and that they had gone to Casal's (Sasala's?) Tavern. They had met Bland there; they left at 11:30 P. M. and took a Maxwell taxi to the A Bar. She said that Mr. Maxwell himself had driven them, but Maxwell, testifying later for the State, said that he did not recall and that the records did not show that he had done so. Mildred testified that they had left the A Bar in Ciminieri's cab at between 1:30 and 2 A. M. with Ellis, and that after they dropped Ellis, she and Eugene had gone to her place, where he had stayed with her until 6:30 A. M.

Mrs. Maxwell later testified for the State that Ciminieri had told her that he had gone to Virginia and North Carolina with a detective to look for Mildred McCrea.

Willie Butler testified in his own behalf as follows:

He is 37 years of age, was born in Georgia, and had two or three years of schooling. He has been convicted of a crime.

On July 19, 1956 he went home after work at 4:30 P. M., and later went to a poolroom at 6:30 or 7 P. M. At about 8:30 he went to the Little Cotton Club and stayed there until 11:30 or 11:45 P. M. He went directly home and to bed, woke at 6 A. M. and went to work. He had no witnesses to corroborate this story.

' He did not remember seeing Coleman at the club but might have spoken to him. He knew him only casually at work; he never went out with him but used to see him at the Little Cotton Club and would drink beer with him. Butler remembered having spoken to "Bill Red" that night, but did not walk out of the tavern with Coleman at any time.

He testified that the sham telegram and the trip to Tennessee were common knowledge, as he had told eight or nine people about them at work. He used to see the Williams brothers around but did not know their names and had never been in their car; he did know Winbush.

Butler said that after his arrest the police, including Captain Krysko and Detective Hauser, had beaten him. They broke his nose and jaw, got blood on his shoes, and

pummelled and kicked him with feet, blackjacks, and fists. He had a lump on his shoulder but most of the beatings left no marks. He denied having had anything to do with the crime, and said that he had not stolen the office key when he had been called inside on June 15, 1956 to move furniture.

Bland Williams testified in his own behalf thus:

He is 20 years of age, was born in Florida, and went through the 9th grade in school. He came to New Jersey in 1954; he had never previously been arrested or convicted of a crime.

On July 19, 1956 he went to Sasala's Tavern with his brother Eugene in the afternoon, and Eugene left at 5:30 or 6 P. M. Bland went home sometime between 6 and 7 P. M., and returned to the tavern at 7:30 or 8 P. M. Eugene and Mildred McCrea came in a little later and left around midnight; Bland went home and to bed shortly afterward, and went to work the next day. Eugene was not home when Bland got in; he arrived at about 6:30 the next morning.

At the time, Bland worked in a garage. He testified, and so did his employer, that he used a knife in his work to cut wires, clean sparkplugs, etc. This was the knife which the police took from him when he was arrested, and which Coleman later identified by a red spot on the handle. Bland testified that he had not noticed such a spot on the handle when the knife was taken from him, but that he sometimes worked around red paint.

After he was arrested, Bland was identified by Coleman in a police lineup. He had known Coleman only by sight. The Buick automobile was owned by his brother Clarence, but Eugene "had control" of it.

After the defense had rested, the State, in rebuttal, offered testimony as to statements taken from the defendants after their arrest. Bland Williams had told the police that on July 19 he had worked until 10 P. M. and had then gone home and was in bed by 11:30 P. M. Willie Butler's statement indicated that on July 19 he had spent only an hour or so in the Little Cotton Club and had left while it was still daylight; he had gone to see a friend. And Eugene Williams

had said that on July 19 he had worked until 6 P. M. and had then gone with Bland to another brother's house. He said he left Bland there at 8:30 P. M. and went to a bar until 9:30 P. M. Obviously, these statements are inconsistent with defendants' testimony.

The State also produced a witness who said that she had seen the three defendants together in a restaurant about two weeks before the killing. And Captain Krysko and Detective Hauser testified that the police had nót beaten Butler.

## I.

### THE ISSUE OF FELONY MURDER.

██ Each indictment charged that the defendant named "did willfully, feloniously and of his malice aforethought, kill and murder one James Quackenbush contrary to the provisions of *N. J. S.* 2A:113–1 and 2A:113–2 * * *." The statutes referred to declare that "[I]f any person, in committing or attempting to commit * * * burglary, * * * robbery * * * kills another * * * such person so killing is guilty of murder," *N. J. S.* 2A:113–1, and that "[M]urder * * * which is committed in perpetrating or attempting to perpetrate *' * * burglary, * * * robbery * * *, is murder in the first degree." *N. J. S.* 2A:113–2.

The burglary referred to in these enactments is common-law burglary, *i. e.,* a breaking and entering into a dwelling house in the night time with the intention of committing a felony. *State v. Burrell,* 120 *N. J. L.* 277, 282 (*E. & A.* 1938) ; *State v. Hauptmann,* 115 *N. J. L.* 412, 425 (*E. & A.* 1935), *certiorari* denied 296 *U. S.* 649, 56 *S. Ct.* 310, 80 *L. Ed.* 461 (1935).

██ The criminal offense in which the accused were alleged to have been engaged when the decedent Quackenbush made his appearance was breaking and entering the building of Koppers Company, Inc., with intent to steal—a high misdemeanor under our statute, *N. J. S.* 2A:94–1. It was not common-law burglary. Reference is made to the

distinction between the two crimes primarily because of a situation which developed at the trial. The theory of the prosecution as it appeared in the opening to the jury was that Quackenbush was killed while the defendants were attempting a robbery—the stealing contemplated being of the personalty of the Koppers Company. Perhaps, because the breaking and entering occurred in the night time, some indecision appeared on the part of the prosecutor while the proofs were being presented as to whether the accusation should be that the murder arose out of attempted burglary. In the course of the argument of the motions for a judgment of acquittal at the close of the State's case, defense counsel requested that a designation be made as to whether the charge was robbery-murder or burglary-murder because both terms had been used. The prosecutor replied:

"We rely on both. We leave it to the Court's decision on the basis of the record so far."

The court then denied a motion to eliminate the element of burglary from the case. At this point, either the motion should have been granted or, in any event, the court should have required the State to specify the theory of its case. But the case was submitted to the jury on the theory that the homicide occurred while the defendants were attempting to perpetrate a robbery, which the common law defines as the felonious taking of personal property from the person or custody of another by force or intimidation. *State v. Compo,* 108 *N. J. L.* 499 (*E. & A.* 1932); 77 *C. J. S. Robbery* §§ 2, 9. The phrase "from the person * * * of another" has been broadly construed to include the taking of personalty from the custody of, or from the constructive possession of, or which is subject to the protection of, another. *State v. Grillo,* 11 *N. J.* 173, 187 (1952); *State v. Lyons,* 70 *N. J. L.* 635, 645 (*E. & A.* 1904); *People v. Kubish,* 357 *Ill.* 531, 192 *N. E.* 543, 545 (*Sup. Ct.* 1934); *People v. O'Hara,* 332 *Ill.* 436, 163 *N. E.* 804 (*Sup. Ct.* 1928); *O'Donnell v. People,* 224 *Ill.* 218, 79 *N. E.* 639 (*Sup. Ct.* 1906); *State v. Adams,* 58 *Kan.* 365, 49 *P.* 81

(*Sup. Ct.* 1897); *State v. Craft,* 299 *Mo.* 332, 253 *S. W.* 224, 227 (*Sup. Ct.* 1923); *State v. Lamb,* 242 *Mo.* 398, 146 *S. W.* 1169 (*Sup. Ct.* 1912); 77 *C. J. S. Robbery* § 9. The robbery referred to in the statute, *N. J. S.* 2A:113–2, making a killing committed in its attempted perpetration murder in the first degree, is the common-law offense and should be defined accordingly in charging the jury.

These considerations bring an important question to the fore. Quackenbush was an ordinary employee whose duty was to take care of the steam boilers at night. There is no proof of any probative force that he was a watchman. Under these circumstances, did his appearance on the scene in his employer's interest during the progress of the theft and his murder which resulted transform the crime into robbery? The significance of the problem in relation to the theory on which the trial was conducted is obvious. If the killing took place during the attempted commission of a robbery, by virtue of the statute it is automatically murder in the first degree; if the offense was not robbery, then the State must bear the burden of showing that the homicide was willful, deliberate and premeditated in order to convict the defendants of murder in the first degree. *N. J. S.* 2A:113–2.

Before embarking upon a discussion of the subject, it may be noted that the State could have proceeded on both theories, namely, felony murder and a willful, deliberate and premeditated killing. The effect of the testimony of Coleman and Beatty is that the defendants, acting in concert, killed Quackenbush because Butler, as a fellow employee, was fearful that he would be recognized. Although the proof shows that Butler wielded the club, knocked the victim down, and continued to beat him, it indicates also that the other defendants continued to kick him while he was on the ground.

But to return to the immediate problem. There can be no doubt that if Quackenbush had been a night watchman, the law would regard him as having sufficient custody of his employer's goods to make the assault upon him an element of robbery. *State v. Lyons, supra.* Can it be said

that the same result follows in the case of an ordinary employee who intervenes in his employer's interest under circumstances such as are present here? The answer must be in the affirmative. Such intervention during the progress of the crime—the act of the employee in coming between the property of his employer and those undertaking to steal it, which precipitates an assault upon him in an effort to complete the taking—makes the crime robbery. And if the assault is fatal, a felony murder has been committed. In this factual setting, the employee's intervention must be considered as bringing the property of the employer constructively into his possession or presence. He was entitled to that possession as against the defendants. This is no undue extension of the common-law doctrine of robbery; it is a sensible and necessary explanation of its scope. In short, it is our view that as against the robber, a servant has the same right to preserve and defend his constructive possession of the property that the owner has. As against the robber, he stands as the owner, and both the common law and our present statute were intended to extend to him the full measure of protection that they afford to the owner or express bailee.

The precise problem has not arisen previously in New Jersey, so far as our reports reveal. But analogous cases may be found elsewhere. For example, in *People v. Downs,* 114 *Cal. App. 2d* 758, 251 *P. 2d* 369 (*D. Ct. App.* 1952), *certiorari* denied *Downs v. State of California,* 348 *U. S.* 944, 75 *S. Ct.* 366, 99 *L. Ed.* 739 (1955), it appeared that while defendants were taking money from the safe of a telephone company, two janitors entered the room. They were overpowered and bound, and the criminal mission was then accomplished. Defendants were convicted of robbery under the California statute, which embodies the common-law description of the offense. On appeal, they unsuccessfully contended that the janitors had no such possession of the money as would support the charge of robbery. The court said [114 *Cal. App. 2d* 758, 251 *P. 2d* 374]:

"We regard it as no undue extension of the robbery statute to hold it applicable to any servant or servants left in sole occupation of the premises or particular part thereof by the employer."

A similar result was announced in New York, whose statute at the time was much the same as the common law. In *Brooks v. People,* 49 *N. Y.* 436 (*Ct. App.* 1872), the proof revealed that an 11 year old girl was left alone in the apartment of her parents. Defendants entered, threatened to kill her if she moved, and then stole property belonging to her father. The offense was held by the Court of Appeals to be robbery, on the theory that the act intended that "the person robbed should be regarded as the owner, as against the robber, of all goods whereof he was robbed." See also: *Neufield v. United States,* 73 *App. D. C.* 174, 118 *F. 2d* 375 (*D. C. Cir.* 1941), *certiorari* denied *Ruben v. U. S.,* 315 *U. S.* 798, 62 *S. Ct.* 580, 86 *L. Ed.* 1199 (1942); *People v. Ficarrotta,* 385 *Ill.* 108, 52 *N. E. 2d* 165 (*Sup. Ct.* 1943); *Reese v. State,* 91 *Tex. Cr. R.* 457, 239 *S. W.* 619 (*Cr. App.* 1922); *Annotation,* 123 *A. L. R.* 1099, 1102 (1939).

As has been indicated, after the killing of Quackenbush the persons involved returned to their primary criminal purpose and removed the safe from the building where efforts were made to open it. Under the circumstances proved there was adequate justification for submitting the issue of robbery-murder to the jury.

Another facet of the case seems to require comment. It was argued before us that the proof which showed that Quackenbush's pockets were turned inside out after he was beaten created a jury question as to whether he was killed in the course of the perpetration of an attempted robbery upon him as well as upon his employer. According to Coleman, after the beating ceased Butler "turned Quackenbush's pockets inside out, went all the way through his pockets—Bland, Eugene, Willie and Winbush." Whether, in naming the four defendants in this connection, Coleman intended to say that each of them individually went through the pockets, was not inquired into by either prosecution or defense. The statement seems to be susceptible of such an inference. Of

course, we do not pass upon its probative value. The strong indication from all of the State's testimony, if believed by the jury, is that the killing was designed as an aid to the accomplishment of the theft of the Koppers Company's goods and to avoid the possibility of detection. With respect to the latter element, it will be recalled that Coleman's assertion was that Butler said: "Damn it, you might recognize me; I mean to kill you." Further, we note that the case was neither tried by the State nor submitted to the jury on a thesis of felony murder arising out of an attempt to rob Quackenbush personally. Any such theory would present some difficult problems which are not necessary to the disposition of the matter, and we do not undertake to pass upon them.

## II.

### The Failure of the Court to Define Robbery.

The main body of the charge to the jury was devoted to a statement of general principles such as the effect of the indictment, the burden of proof, presumption of innocence, definition of reasonable doubt, a reading of *N. J. S.* 2A:113-1 and 2, and the like. The recitation of the statutes, which describe the various kinds of murder, was followed by the statement on two occasions that the contention of the State was that the killing was committed in "perpetrating or attempting to perpetrate a robbery" and "therefore they are amenable to the law for the death of the deceased, and the crime committed is that of murder in the first degree, as declared by the statute." At a later point, the court said:

"If, therefore, the defendants, or any of them, killed James Quackenbush in perpetrating a robbery, or in attempting to perpetrate a robbery, they are guilty of murder in the first degree. If, however, none of the defendants killed James Quackenbush in perpetrating or attempting to perpetrate a robbery, but killed him in the commission of some other unlawful act against the peace of this State, of which the probable consequences may be bloodshed, then they are guilty of murder in the second degree. * * *."

There was no discussion of the facts nor any effort to relate them to the statutes for the purpose of presenting the issues to be deliberated upon by the jury. Toward the close of the charge, the court read to the jury 60 requests to charge from the defendants and the State. The requests were repetitious of each other and of matters already covered. Although the charge had spoken in terms of robbery-murder except for the one reference to second degree murder, a request to charge of one of the defendants was given (without relation to the facts) to the effect that unless the homicide was committed in perpetrating or attempting to perpetrate a robbery, it "must have been not only willful, but also deliberate and premeditated, in order to render it murder in the first degree."

At the conclusion of the charge, defense counsel called to the court's attention the fact that he had failed to define robbery. Some discussion followed as to whether a written request to do so had been submitted, during which it became apparent that through inadvertence such a request was in a group originally handed up and later withdrawn and replaced by the requests actually charged. In any event, before the noting of objections had been completed by all attorneys, counsel for Bland Williams again said:

"I also now reiterate the objection to the Court's charge as requested by the Prosecutor, of the word 'robbery,' without the Court having defined for the benefit of the jury what the term robbery is. Robbery is a statutory crime, defined by the statute, and has been explained by the cases, and I think it is error to leave it out and not inform the jury specifically."

Immediately after this statement, at the request of the court, the jury was recalled and some further instructions were given on another subject. The request to define robbery was ignored.

The traditional function of the judge is to instruct the jury as to the law governing the issues to be decided by them under the facts of the particular case. The classical practice generally followed in criminal cases is for the judge to outline the applicable law, explaining and defining the offense charged, and the jury, thus becoming informed as to the exact law which they must decide has or has not

been violated, places its determination of the facts along-side the law and decides whether its verdict shall be guilty or not guilty. *Morris v. United States,* 156 *F.* 2*d* 525, 169 *A. L. R.* 305 (9 *Cir.* 1946). To fail to define the offense attributed to the accused and the essential elements which constitute it, is to assume that jurors are educated in the law—an assumption which no one would undertake to justify. On the contrary, the appearance of a person with legal train-ing on the jury panel would be a rarity. The criminal law cannot be administered justly or efficiently if the jury is allowed to speculate as to what conduct the law intended to proscribe by a specified crime. Accordingly, we hold the view that a mandatory duty exists on the part of the trial judge to instruct the jury as to the fundamental principles of law which control the case. Among such principles is the defini-tion of a crime, the commission of which is basic to the prosecution against the defendant. And the duty is not affected by the failure of a party to request that it be dis-charged. Whether, in the absence of objection, such failure constitutes plain error, would depend upon the circumstances of the particular case.

In the present case the primary issue submitted to the jury for determination was whether the homicide had oc-curred in the perpetration of a robbery. If there was a robbery, according to the legal connotation of that term, then the State was relieved of the specific task of proving that the killing was willful, premeditated and deliberate. And throughout the trial the energies of the prosecution were devoted to the contention that a robbery-murder had been committed. Consequently, it was crucial for the jury to understand the meaning of the crime which subjected the accused to the extreme penalty upon proof of a death during the course of its commission, regardless of the absence of intent to cause that death.

Robbery is a term which in the lay mind is rarely distinguished from larceny, burglary and particularly from larceny from the person. This fact alone creates a funda-mental need for jury education. And it should be furnished

by proper and adequate definition of the essential elements of robbery, irrespective of specific request by counsel. An accused is entitled to assume that the elemental principles governing the accusation against him will be covered in the charge of the court. But when that course is not pursued and an oral request to do so is submitted, it cannot be ignored. The right to the instruction is absolute. *State v. Bunk,* 4 *N. J.* 461, dissenting opinion at 477 (1950), *certiorari* denied 340 *U. S.* 839, 71 *S. Ct.* 25, 95 *L. Ed.* 615 (1950); *State v. Gregory,* 120 *N. J. L.* 326 (*Sup. Ct.* 1938); *State v. DeGeralmo,* 83 *N. J. L.* 135 (*Sup. Ct.* 1912). For the deficiency in the charge has left the jury without "the legal implements to reach and form a verdict." *State v. Wynn,* 21 *N. J.* 264, 271 (1956). This has been the rule in civil cases in New Jersey for many years. *Hartwyk v. Shea,* 114 *N. J. L.* 235 (*Sup. Ct.* 1935); *Kruschka v. Konvitz,* 13 *N. J. Misc.* 299 (*Sup. Ct.* 1935); *Rowland v. Wunderlick,* 113 *N. J. L.* 223 (*Sup. Ct.* 1934). Where the life or liberty of an individual is at stake no less liberal rule can be applied. Such is the plain implication of *State v. Wynn, supra.*

The duty of the court in this respect is fully recognized in other jurisdictions. *Screws v. United States,* 325 *U. S.* 91, 65 *S. Ct.* 1031, 89 *L. Ed.* 1495 (1945); *Shurman v. United States,* 219 *F.* 2d 282 (5 *Cir.* 1955), *certiorari* denied 349 *U. S.* 921, 75 *S. Ct.* 661, 99 *L. Ed.* 1253 (1955); *Lott v. United States,* 218 *F.* 2d 675 (5 *Cir.* 1955), *certiorari* denied 351 *U. S.* 953, 76 *S. Ct.* 848, 100 *L. Ed.* 1477 (1956), rehearing denied 352 *U. S.* 860, 77 *S. Ct.* 25, 1 *L. Ed.* 2d 70 (1956); *Kenion v. Gill,* 81 *U. S. App. D. C.* 96, 155 *F.* 2d 176 (*D. C. Cir.* 1946); *Williams v. United States,* 76 *U. S. App. D. C.* 299, 131 *F.* 2d 21 (*D. C. Cir.* 1942); *Miller v. United States,* 120 *F.* 2d 968 (10 *Cir.* 1941); *Tyler v. State,* 89 *Ga. App.* 535, 80 *S. E.* 2d 78 (*Ct. App.* 1954); *Payne v. Commonwealth,* 306 *Ky.* 600, 208 *S. W.* 2d 726 (*Ct. App.* 1948); *People v. MacPherson,* 323 *Mich.* 438, 35 *N. W.* 2d 376 (*Sup. Ct.* 1949); *State v. Higgins,* 252 *S. W.* 2d 641 (*Mo. App.* 1952); *State v. Hairr,* 244 *N. C.* 506, 94 *S. E.* 2d 472 (*Sup. Ct.* 1956); *State v. Stroupe,*

238 *N. C.* 34, 76 *S. E.* 2d 313 (*Sup. Ct.* 1953); *Commonwealth v. Cramer,* 168 *Pa. Super.* 1, 76 *A.* 2d 661 (*Super. Ct.* 1950); *Commonwealth v. Weatherwax,* 166 *Pa. Super.* 586, 73 *A.* 2d 427, 428 (*Super. Ct.* 1950).

In *Commonwealth v. Weatherwax, supra,* the conviction of robbery was reversed on appeal, the court saying:

"[T]here was reversible error in the failure to define the offenses charged in the indictment. The trial judge made no reference to the charges except to name them * * *. The offenses named in the indictment were most serious and the failure of the trial judge to define them and to relate them to the single crime of robbery disclosed by the Commonwealth's proofs, was fundamental error. Robbery itself is a term popularly used loosely, to connote larceny, larceny in the perpetration of burglary, larceny from the person, as well as other offenses which are not robbery at all. * * * The jury should have been given definite instructions as to the essentials of robbery in this case. * * * And we * * * intend to adhere to the rule that, as to serious crimes, it is a fundamental duty of the trial judge to give full and explicit instructions as to the nature of the charges. * * *."

As a final word on the subject, the opinion in *Williams v. United States, supra* [76 *U. S. App. D. C.* 299, 131 *F.* 2d 23], is worthy of specific reference. There the court said:

"It can now be clearly seen that to hold this charge sound would be to assume that jurors are wise in the law; * * *. Such an assumption violates the accepted division of functions between judge and jury. It is almost, if not, as important to a defendant to have a jury instructed on the law applicable to his particular case by the judge, who knows the law, as to have a jury of his peers. The latter is supposed to safeguard our institution of fair trial by insuring impartiality. But of what value is an open mind, if it does not know, with clear delineation, the issues upon which it is to pass judgment? Just as a lawyer might be ignorant in a meeting of scientists, so may a juror be in his casual acquaintance with the law. * * *."

This was a long, important and expensive trial. But in the factual context the issue of whether robbery had been committed was crucial and the failure to define it was clearly prejudicial error. The State suggests in its brief that if the facts do not warrant a finding of robbery so as

to sustain the theory of felony murder, this court should "invoke its inherent powers and sustain the verdict as one of murder in the second degree." We have no authority to intrude upon the exclusive function of the jury.

For the reasons stated, the convictions must be reversed and a new trial ordered.

## III.

### THE DENIAL OF DEFENSE APPLICATION FOR PSYCHIATRIC EXAMINATION OF THE STATE'S PRINCIPAL WITNESS COLEMAN.

Coleman's testimony was vital to the prosecution. Without it there would have been little more than Butler's admission to Beatty. Whatever might have been its adequacy to create a jury question against Butler, the admission was excluded as to Eugene and Bland Williams. Thus, Coleman's mental competency and credibility were of transcendent importance.

Prior to trial both the State and the defense learned that Coleman had been a mental patient in the Crownsville State Hospital in Maryland from July 9 to September 5, 1954. The diagnosis was "Chronic Brain Syndrome associated with Convulsive Disorder with Behavior Reaction." The examination revealed that he:

"[W]as functioning within a moderate defective range of intelligence, that he is an anxious and insecure individual who tries to avoid all difficult life situations, that when confronted with unavoidable difficulties he may try to bluff through them or become panic stricken and respond with a gross emotional outburst resembling a temper tantrum."

However, he was not psychotic.

In advance of the trial date defendants applied to the court for an order for psychiatric examination. The State, aware of Coleman's impending appearance as its witness, arranged for such an examination in its own interest, with his consent and that of his counsel. The prosecutor opposed the defendants' motion and Coleman's attorney indicated that

he would not consent. He said that he and Coleman had agreed to the examination on behalf of the prosecutor "but I do not see where any further examination is warranted." The court denied the request, declaring that the matter of competency of a witness to testify was for determination by the court alone, but that he would give the defendants such portions of the reports of the State's doctors as would show their opinion on this subject. The inference from the record is that counsel were advised that Coleman was not found to be incompetent. However, they do not appear to have received copies of any portions of the medical reports. The undisputed facts are that the reports were privately submitted to the trial court, who considered them *ex parte* and concluded that Coleman was competent to testify. He decided also that the defendants' motion for copies of the reports should be denied.

Apparently the application for examination was not considered as finally disposed of until the end of the State's case when the court, in the presence of the jury, said:

"Now there is another motion that is pending, too. I believe this is the only one that is pending so far as the recollection of the Court is concerned. That was an application made by counsel for the defense for a mental examination of the witness Coleman. This was objected to by the State, but the Court can see no reason to sustain the State's prior objection to this, and will permit whatever mental or physical examination of Coleman or any other witness who may have been called by the State, are required by the defense.

Witnesses of facts are not chattels, and may, of course, be interviewed by anyone. This applies to Coleman in particular, concerning whom the application was made. He is not a defendant in this action and he is not a party to the cause. The Court has no authority to order or direct a witness to be either interviewed or examined by anyone and the Court having no authority to order or direct a witness in this case as distinguished from a defendant. The Court feels, therefore, that it cannot order or direct the physical examination or mental examination of Coleman or any other witness."

Refusal to grant such an order is made a ground of appeal. ▮ At the outset of a discussion of the strictly legal aspects of the problem, a few preliminary observations may be made. The trial of a criminal cause is a quest for truth

and justice, not merely a contest for a tactical advantage over an adversary or for a favorable verdict irrespective of its relation to the basic objective of the proceedings. When reasonable ground for doubt as to a person's mental capacity as a witness becomes known to the parties and to the court, and lives may depend upon his testimony, the proper administration of justice in the public interest ought to stimulate a cooperative voluntary effort to establish a means of mutual solution of the problem. A variety of methods suggest themselves: agreement (a) that the court may appoint an impartial expert, (b) that each party may select one expert and the court a third, for joint examination, or (c) that each party may engage the services of an independent expert. See *People v. Hudson,* 341 *Ill.* 187, 173 *N. E.* 278 (*Sup. Ct.* 1930). In such a situation it is fundamentally unfair for one interested party to obtain an examination by self-selected experts and to oppose the granting of the same right or privilege to the other. This is particularly true where, as in this instance, counsel for the defense offered to exchange reports, and objected to receiving only selected portions of the prosecutor's reports. And at this point we consider it appropriate to observe that the defense attorneys were not permitted to present themselves to Coleman at his place of confinement and ask him to discuss the matter with them, individually or as a group, unless a representative of the prosecutor's office, an attendant at the jail and his counsel were present. Such action, except as to the presence of Coleman's counsel, we deem to be an undue limitation on the right of the defendants to prepare their case for trial.

Presently there is no express rule of practice which authorizes a pretrial order for psychiatric examination of a witness. *R. R.* 3:5–10(c) makes it possible after the issuance of a *duces tecum* subpoena to obtain a direction from the court to produce books, papers and documents before trial for purposes of inspection and copying by the parties and their attorneys. There can be no doubt of the authority of the court to promulgate a comparable rule for the pretrial production, through the use of a subpoena, of a known

witness in the court having jurisdiction of the cause (in whose trial list it is pending) for medical examination as to his mental competency to testify. And even in the absence of such a rule, in our judgment the inherent power of the trial court having jurisdiction of the action to issue a subpoena for that purpose is adequate. *Cf. Polulich v. J. G. Schmidt Tool Die & Stamping Co.,* 46 *N. J. Super.* 135 *(Cty. Ct.* 1957); *Matter of Peterson,* 253 *U. S.* 300, 40 *S. Ct.* 543, 64 *L. Ed.* 919 (1920); *De Rosa v. Viggiano,* 81 *N. Y. S. 2d* 481 *(Sup. Ct. Sp. Term* 1948); *Pendleton v. Commonwealth,* 131 *Va.* 676, 109 *S. E.* 201 *(Sup. Ct. App.* 1921); 9 *Wigmore on Evidence (3d ed.* 1940), § 2484. As Justice Brandeis said in *Matter of Peterson, supra,* 253 *U. S.* at *page* 312, 40 *S. Ct.* at *page* 547:

"Courts have (at least, in the absence of legislation to the contrary) inherent power to provide themselves with appropriate instruments required for the performance of their duties."

Wigmore states the theory this way:

"But the general judicial power itself, expressly allotted in every State constitution, implies inherently a power to investigate as auxiliary to the power to decide; and the power to investigate implies necessarily a power to summon and question witnesses." 9 *Wigmore, Evidence (3d ed.),* § 2484, at *page* 267.

An example of the exercise of the authority appears in *Commonwealth v. Kosh,* 305 *Pa.* 146, 157 *A.* 479 (1931), where after conviction and on appeal the Supreme Court of Pennsylvania ordered a psychiatric examination of an important witness for the Commonwealth whose mental capacity had been challenged at the trial. In our own State the existence of the power to conduct a preliminary hearing as to the competency of a defendant to be a witness and to conduct his defense has always been recognized. *State v. Peacock,* 50 *N. J. L.* 34 *(Sup. Ct.* 1887), reversed on other grounds 50 *N. J. L.* 653 *(E. & A.* 1888); *State v. Noel,* 3 *N. J. Misc.* 1154 *(O. & T. 1925).*

Other instances are to be found. In *State v. Emrich,* 252 *S. W. 2d* 310 *(Mo. Sup. Ct.* 1952), prior to trial the defend-

ant challenged the mental capacity of a witness for the State. Four doctors examined him shortly before trial and three of them testified as to his competency. Thereupon the witness was allowed to testify. The procedure was held proper.

In *Goodwin v. State,* 114 *Wis.* 318, 90 *N. W.* 170, 171 (*Sup. Ct.* 1902), the defendant was convicted of assault with intent to kill. Concerning a similar challenge, the appellate court said that the trial judge had power in his discretion "not so much to compel the examination, but to make it a condition of further entertaining the prayer for relief. Nor should we doubt that in a proper case, where the court was seriously doubtful of the mental competency of a proposed witness, he might impose a medical examination as a condition of allowing the witness to testify."

A person does not have to be entirely sound mentally in order to qualify as a witness. A certain minimal intelligence is required. He should have sufficient capacity to observe, recollect and communicate with respect to the matters about which he is called to testify, and to understand the nature and obligations of an oath. *State v. Mohr,* 99 *N. J. L.* 124, 127 (*E. & A.* 1923); 97 *C. J. S. Witnesses* § 57. Where there is evidence of mental derangement or feeblemindedness, the inquiry is whether the deficiency is sufficient to render his testimony untrustworthy. *State v. Wildman,* 145 *Ohio St.* 379, 61 *N. E. 2d* 790 (*Sup. Ct.* 1945); *State v. Webb,* 131 *N. E. 2d* 273 (*Ohio C. P.* 1955); *Wigmore, supra,* § 492, *p.* 585.

Under the law of this State, the mental qualification of a person to be a witness is a matter for the discretion of the court. As far back as 1819 it was held that where the issue is raised during the course of the trial, "when the witness comes to the book, the truth of the fact must first be tried," by the judge "by inspection only," *Den v. Vancleve,* 5 *N. J. L.* 589, 695, 765 (*Sup. Ct.* 1819); "and * * * this inspection consists in putting interrogatories to the alleged lunatic in order to discover not only the fact but also the degree of intellectual deficiency, if it exists, and

admit or reject the witness, according as it is found that he is or is not so mentally impaired as to render his statements, if examined as a witness, valueless." *State v. Mohr, supra,* 99 *N. J. L.* at *page* 127.

These cases suggest that the determination of the challenge to a witness' competency is to be made through physical inspection and interrogation by the court alone and that no extrinsic aids may be employed. Wigmore therefore contends that the holding is unsound, § 497, *p.* 590, *note* 4. But if such a doctrine was intended, we cannot be unmindful of the fact that the decision was first rendered in 1819, long before the science of psychiatry had developed to its present level. See *State v. Simes,* 12 *Idaho* 310, 85 *P.* 914 (*Sup. Ct.* 1906); *Aguilar v. State,* 279 *App. Div.* 103, 108 *N. Y. S.* 2d 456 (*App. Div.* 1951); "Psychiatric Challenge of Witnesses," 9 *Vanderbilt L. Rev.* 860 (1956); "Psychiatric Evaluation of the Mentally Abnormal Witness," 59 *Yale L. J.* 1324 (1950).

However, both *Vancleve* and *Mohr* are indicative of the general practice which permits a challenge to the capacity of a witness to be made when he is called to testify and before he is sworn. Thereupon, a preliminary inquiry is engaged in by the court in order to decide the matter. At that point, unquestionably the court has jurisdiction over the witness. *Hadley v. State,* 25 *Ariz.* 23, 212 *P.* 458 (*Sup. Ct.* 1923); *State v. Cosler,* 39 *Idaho* 519, 228 *P.* 277 (*Sup. Ct.* 1924); *State v. Simes, supra; State v. Teager,* 222 *Iowa* 391, 269 *N. W.* 348 (*Sup. Ct.* 1936); *State v. Alberts,* 199 *Iowa* 815, 202 *N. W.* 519 (*Sup. Ct.* 1925); *Wolfson v. Chelist,* 278 *S. W.* 2d 39 (*Mo. App.* 1955), affirmed 284 *S. W.* 2d 447 (*Mo. Sup. Ct.* 1955); *Linder v. State,* 156 *Neb.* 504, 56 *N. W.* 2d 734 (*Sup. Ct.* 1953); *State v. Morrison,* 43 *Wash.* 2d 23, 259 *P.* 2d 1105 (*Sup. Ct.* 1953).

When the challenge is made, both parties may introduce whatever relevant evidence they have on the issue of insanity or mental weakness. At that stage of the proceedings the

court can order medical examinations. The advantage of doing so in advance of trial in a proper case is that delay may be avoided. The hearing may be conducted in or out of the presence of the jury in the discretion of the court. It may be desirable to take the testimony in the presence of the jury because, assuming a finding of competency to testify, ordinarily the evidence is relevant on the subject of the credibility of the witness. *Taborsky v. State,* 142 *Conn.* 619, 116 *A. 2d* 433, 437, 49 *A. L. R. 2d* 1238 (*Sup. Ct. Err.* 1955); *People v. Hudson, supra; State v. Alberts, supra; Alleman v. Stepp,* 52 *Iowa* 626, 3 *N. W.* 636 (*Sup. Ct.* 1879); *State v. Cade,* 215 *N. C.* 393, 2 *S. E. 2d* 7 (*Sup. Ct.* 1939); *State v. Morrison, supra,* 259 *P. 2d* at page 1112; *United States v. Hiss,* 88 *F. Supp.* 559 (*D. C. N. Y.* 1950).

In the present case it is true that defendants did not object to Coleman taking the witness stand at the trial, nor did they ask then for a hearing as to his competency. The better practice called for such action. However, in mitigation it may be noted they had made their preliminary motion for psychiatric examination; the court had been made fully aware of their position; he had received the reports of the State's psychiatrists; they cross-examined Coleman on his past medical history; and their motion for the examination was not finally disposed of until after the State had rested its case. And in their own defense the letter from the Maryland institution was introduced in evidence. In any event, it is not necessary to decide whether an adequate record was made for purposes of review in this court of the denial of the request. But since a retrial is to follow, the importance of discussion of the matter is obvious.

 Coleman's previous medical history and the reports of the State's psychiatrists, which were received before the motion was decided (the latter were submitted to us at our request), warranted the granting of the defense request for examination. Whether it should be allowed prior to the retrial or at the trial when the challenge is interposed to

his competency, is a matter for the court's discretion. But the determination of the question must be made after hearing in open court and examination and cross-examination of the various witnesses. *Butler v. State,* 217 *Miss.* 40, 63 *So. 2d* 779 *(Sup. Ct.* 1953). The *ex parte* decision at the trial now under review deprived the defendants of the substantial right to contest the issue of competency and to supply the jury with pertinent evidence on the important problem of credibility. As was said in *United States v. Hiss, supra:*

"The existence of insanity or mental derangement is admissible for the purpose of discrediting a witness. Evidence of insanity is not merely for the judge on the preliminary question of competency, but goes to the jury to affect credibility."

Moreover, the inquiry as to veracity is not limited to statements made by Coleman to the doctors for the purpose of evaluating the extent of any mental weakness. His assertions to them with respect to the commission of the crime are admissible and their notations and reports with respect thereto may be employed on cross examination if the court determines that he is competent to testify. *State v. Hunt,* 25 *N. J.* 514 (1958).

Manifestly, a practice of granting psychiatric examination of witnesses must be engaged in with great care. Orders to permit it to be done should be executed only upon a substantial showing of need and justification. Otherwise the course of trials would be unduly disrupted and their efficacy diminished. However, the boundaries of the court's discretion cannot be outlined with precision. Much reliance must be placed upon the judgment of the trial court in the individual case. *Cf. Rule* 11, *American Law Institute Model Code of Evidence; Rule* 8, *Report of the Supreme Court Committee on the Law of Evidence, p.* 17 (1955); *Rule* 8, *Report of Legislative Commission to Study the Improvement of the Law of Evidence* (1956). For the present, we go no farther than to say that in this instance the circumstances patently call for such an order.

## IV.

### Other Alleged Trial Errors.

#### (a)
#### Admissibility of gruesome photographs.

The record contains nine photographs of the deceased dressed and undressed which vividly portray the beating he suffered. They were taken at various angles with the body in different positions apparently for the purpose of showing the many lacerations and bruises inflicted. Thus, they serve to indicate in some measure that the assault was not limited to a single lethal blow struck on the spur of the moment, but rather was persisted in for some appreciable period of time. Moreover, our examination does not reveal them to be of the horrendous type condemned in *State v. Bucanis,* 26 *N. J.* 45, 54 (1958).

Error cannot be predicated upon their admission.

#### (b)
#### The prosecutor's comments in summation.

Defendants contend that a mistrial should have been granted because the prosecutor in summation indicated a personal belief in their guilt. He said:

"* * * I say to you that you have a solemn sacred duty, *if you feel as I do,* that these men on the night of the 19th and the early morning of the 20th beat James Quackenbush to death, and *if you feel as I do,* and if you have that sacred duty and responsibility, I ask you to find them guilty of murder in the first degree." (Emphasis added)

The statement in context seems to have been predicated upon and as part of an argument related to the facts adduced. There is no indication that reference or insinuation was being made to some extraneous matter known to the prosecutor but not within the proof. The latter type of comment is prejudicially erroneous. *State v. Ferrell,* 29 *N. J. Super.* 183, 186 (*App. Div.* 1954); *State v. McCormack,* 93 *N. J. L.*

287 (*Sup. Ct.* 1919), affirmed 94 *N. J. L.* 262 (*E. & A.* 1920). There are authorities holding that expressions of the former class are not improper. See *State v. Pisano,* 33 *N. J. Super.* 559 (*App. Div.* 1955), certification denied 19 *N. J.* 385 (1955); Annotation 50 *A. L. R.* 2d 766 (1956). It is often difficult to draw the line between what is doubtfully permissible and what is clearly wrong. Much must be left to the experienced judgment of the trial court and to a sensitive awareness by the prosecutor of the influence of his official position. Expressions of personal belief of a defendant's guilt are banned by *Canon* 15 of the *Canons of Professional Ethics. R. R.* 1:25. Violation of the canon *per se* would not warrant the reversal of a finding of guilt by a jury but it is a factor for consideration. However, review of the matter in this instance does not persuade us that the refusal of a mistrial constituted a mistaken use of discretion.

A further motion for mistrial was made when the prosecutor said:

"* * * Don't send him to the chair. * * * You'll wake up at night remembering 'Thou shalt not kill', with three murderers roaming the streets if you don't convict these men."

A defense objection was sustained; the court announced that he would instruct the jury as to the impropriety of the remark and he did so in his charge. It is not necessary to decide whether the remark was sufficiently inflammatory and prejudicial to necessitate a reversal. See *State v. Siciliano,* 21 *N. J.* 249 (1956); *State v. Morris,* 248 *S. W.* 2d 847 (*Mo. Sup. Ct.* 1952). Suffice it to say that it was improper and should not be repeated at the retrial.

(c)
Poll of the jury.

The manner in which the jury was polled after returning the verdict was called to our attention. Although it was not

raised as a ground of appeal, comment on the procedure followed seems advisable.

When the jury returned, the foreman, in response to a question by the clerk of the court, said (as to each defendant) that a unanimous verdict had been agreed upon. Then the clerk said:

"By your unanimous verdict how do you find with reference to the defendant, Willie Butler?

The Foreman: We find Willie Butler guilty of murder in the first degree.

The Court: Poll the jury.

The Clerk: Each of you jurors as your names are called, with reference to the verdict of the defendant, Willie Butler, be kind enough to render your own individual verdict.

Anthony Abbey, individually, how do you find as to the defendant, Willie Butler?

"Anthony Abbey: *Guilty.*"

Thereafter, the same question was put to each juror and the answer was the same: "Guilty." That procedure was followed in the case of all of the defendants and in each instance the answer of the individual juror was "Guilty," with no further specification. At the conclusion of the poll as to each defendant, the clerk said:

"Hearken to your verdict as the Court has ordered it recorded: As to the defendant Willie Butler, by a unanimous verdict you say you find Willie Butler guilty of murder in the first degree. So say you all.

*The Jury:* Yes."

The record does not show whether each juror said "Yes" or nodded his head, or just how the court reporter satisfied himself as to the collective affirmative.

 Poll of a jury is an important element of a murder trial. Precautions must be taken to eliminate any doubt as to the precise nature of the verdict. A verdict of "guilty" is inadequate. *State v. Cleveland,* 6 *N. J.* 316, 322 (1951); *State v. Cooper,* 2 *N. J.* 540 (1949); and note particularly *Williams v. State,* 60 *Md.* 402 (*Ct. App.* 1883), cited in *Cleveland,* 6 *N. J.* at *page* 323. The procedure of polling

was discussed specifically in *State v. Smith,* 27 *N. J.* 433 (1958) ; *State v. Huff,* 14 *N. J.* 240, 255 (1954) ; *State v. Myers,* 7 *N. J.* 465, 483 (1951) ; and see, *Heinze v. State,* 184 *Md.* 613, 42 *A.* 2*d* 128, 132 (*Ct. App.* 1945). After the foreman has announced the verdict as the determination of the jury, the basic purpose is to ascertain the fact of individual *concurrence.* Adherence to a *modus operandi* approved in the cited cases—under the watchful guidance of the court—will obviate any risk of error.

## V.

For the reasons expressed, the judgments of conviction are reversed and the matter is remanded for a new trial.

WACHENFELD, J., concurring in result.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, FRANCIS and PROCTOR—6.

*For affirmance*—None.