In the matter of the application of A. B. M. for a writ of *habeas corpus* for her infant child M. M., also known as M. A. M.

[Submitted May 19th, 1942. Decided October 15th, 1942.]

Mr. *William B. Morley* and Mr. *John F. McCann* (*Mr. Martin J. Cummins,* of counsel), for the petitioner-respondent.

Messrs. *Vanderbach & Vanderbach* (*Mr. Lewis W. Vanderbach,* of counsel), for the respondents-appellants.

The opinion of the court was delivered by

RAFFERTY, J.

This is an appeal from a decree entered in a *habeas corpus* proceeding in the Court of Chancery awarding to the mother the custody of her infant daughter. The basis of the determination below was that it did not appear that the mother had abandoned the child, nor that she was an unfit person to have custody and hence was entitled thereto.

We have concluded that it is shown indisputably that the mother did abandon the child and that the best interests of

the child will be served by leaving it with the appellants herein who presently have custody. In this view, it is unnecessary to consider the question of fitness of the mother. A somewhat extended recital of the facts is necessary.

The child was born out of wedlock in New York City on April 27th, 1939. The mother had a previous child born also out of wedlock who presently resides with her and since the birth of the child here involved she became pregnant of a third child while still unmarried, but about one month prior to the birth of the third child she married its father who states here that he is fully aware of all of the circumstances in the case and is agreeable to accept this child into his household and to proceed in adoption of her.

The casual acquaintance with O., the putative father of the child, begun on a street corner in New York City, swiftly ripened into the intimacy which resulted in the birth of this child. Some time after she found herself pregnant, the mother communicated with O. through a mutual acquaintance and was directed to a Dr. C. in New York City who, from all that appears, is a reputable physician in that city.

Dr. C. arranged for respondent to enter St. Faith's Home, Tarrytown, New York, an institution maintained for the purpose of caring for unmarried expectant mothers. This institution requires the expectant mother to do certain work in and about the institution prior to delivery and after delivery the mother was to continue at the institution for a period of time and if she did not take her child with her upon leaving, she was to consent to adoption of the child in a family of Protestant faith. Respondent, who appears to have been of the Catholic faith, would not agree to this latter requirement and left that institution. Dr. C. then had her admitted into Angel Guardian Home, a Catholic institution in New York City, whose requirements were substantially the same as those of St. Faith's Home except that, if adoption was to be had, the child would be adopted by a family of the Catholic faith and also that the mother would be required to institute bastardy proceedings against the putative father to provide for the maintenance and support of the child. After a short time at this latter institution

respondent left there also apparently because she did not take kindly to the regimen, nor did she wish to institute any proceedings against the putative father. She was then sent to a private home where she stayed until the delivery of the child and thereafter returned for a period to this private home.

Shortly after the birth of the child and prior to the mother being discharged from the hospital, Dr. C. caused to be delivered to appellants herein this infant child. Appellants have had the child since that time and appear to have provided her with a proper home and are of adequate circumstances to give to her a proper upbringing. Appellants are otherwise childless and, desiring to adopt a child, found their way to Dr. C. who arranged for them to have the child here involved. Appellant husband is engaged in private business and his net earnings approximate $85 per week. There is testimony indicating that his home is a proper one and that he and his wife are of good character and reputation. That the course followed by Dr. C. was by prearrangement with the mother is clearly evident.

At the birth of the child the mother did not ask to see her nor did she make such request at any time while she was in the hospital. She did not ask about the baby or its whereabouts upon release from the hospital. V. U., a registered nurse at the hospital at the time of the birth, testified that the mother at no time asked that the baby be brought to her; that Dr. C. conferred with the mother while she was at the hospital; that the mother knew of the arrangements made and did not inquire as to the baby when she left the hospital. The failure of the mother to inquire for the baby is made even more significant by the fact that she is a registered nurse and, it is to be assumed, was well acquainted with hospital routine. Her failure to inquire as to the reason it was not brought to her speaks eloquently of prearrangement with Dr. C. She testified that she was well satisfied with the doctor's services both in delivering the child and placing the child and on May 14th, 1939, in writing to Z., an intermediary for the putative father, said, "Will you kindly tell Dr. C. that everything is all right and again I wish to thank

both of you for everything." Later she delivered the birth certificate of the child to Z. because "I didn't know what to do with it, I was going home." Z. visited the mother several times during her pregnancy and testified:

"Q. At any time during any of these visits was there any conversation raised or the subject discussed, concerning placing this baby out for adoption? A. Well, not specifically that way, the idea or the subject of adoption, it wasn't brought up that way, it was how to get rid of the baby whether it was adoption or leaving it at some home.

"Q. No matter what happened she wanted to get rid of the baby by adoption or leaving it in a home? A. That was the idea exactly.

"Q. Did she ever tell you that at any time that she only wanted that child placed out until she could go to work and then she would want custody of the child again? A. Positively not."

Dr. C. testified that respondent knew of the arrangement for the adoption prior to the birth of the child and was perfectly satisfied therewith and that at her request "I gave specific orders that she was not to see the child." He testified that the mother wished to have the child adopted so that she could return to work and that her object was to have her expenses paid and the child adopted. Dr. C. testified further that:

"Q. Now, doctor, at any time all during this time you were attending this woman was her attitude that she wanted to get rid of this child as quickly and as completely as possible? A. Yes, as quickly as possible.

"Q. Did she at any time tell you that she merely wanted to place this child out in custody of somebody until she was ready, at her pleasure, to take it back? A. No.

"Q. Under those circumstances would you have placed the custody of the child in the [appellants]? A. Absolutely not."

On May 1st, 1939, respondent wrote to a representative of Angel Guardian Home as follows:

"I believe **Dr. C.** is taking care of everything 'privately' but I certainly want to sincerely thank you for your kindness and interest.

I'll really never forget that. I still hate to give up the baby I Haven't seen and I hope God will forgive me if I'm doing a wrong which at present seems the only way."

The husband appellant testified that he and his wife took the child from the hospital ten days after birth and by arrangement made with Dr. C. prior to the birth took her with the understanding that they would have the right to adopt her and also that they paid the lying-in expenses.

From the foregoing, the inference is unavoidable that this mother desired that the child should be taken from her and given to a suitable family for adoption, that she was satisfied with the arrangements made. Otherwise, the experience of all nature runs counter to her behavior and her expression of approval of what had been done.

Throughout her pregnancy and after the birth of the child, respondent was more concerned about her own convenience and the fear that her parents might learn of her predicament. On April 14th, 1939, two weeks prior to the birth, she wrote to Z. stating that she feared her mother had some word of her trouble and asked "Do you think this Social Service business had notified her?" In the same letter she said, "The mistake I made was in giving my correct name & too much true information—it's going to be tough getting out of here free & continuing my own life as I please but I'm praying for the best. God knows I'll never make another mistake! Thank you for everything." She testified that she delayed in acquainting O. with her condition of pregnancy because "I didn't want to bring him into it if I could help it, I just wanted to go my own way." She also testified that her lying-in expenses were to be paid and that O. would provide her with sufficient money contribution to forward to her parents to allay any suspicion that they might have that she was not well.

After the birth of the child this mother did nothing evidencing concern respecting the care or maintenance of the child. She might have stayed at St. Faith's Home or Angel Guardian Home for a sufficient period of time to permit her complete recovery without charge to her except for the work

performed at the institution and for which she would not be otherwise compensated. Rather, she made the arrangement which brought the baby to appellants. She did not want to bother O. about the matter, did not ask a marriage with him but was content that the child should be born in bastardy and refused to institute proceedings against him to require him to maintain and support the child and thus permit her to retain custody. On March 31st, 1939, she wrote to a friend of O. stating "One of the things that they are trying to persuade me to do is to 'institute paternity proceedings! !' Oh, it is an awful mess all the way round but if I have to walk out & jump off the B'klyn Bridge I won't stay 5 mos. in The Angel Guardian Home for anybody." A social worker at Angel Guardian Home testified that the mother would have been obliged to stay only for such period of time as was necessary to enable her conveniently to leave the child and in some cases this period was as short as six weeks; that the mother could have gone to work and could have had the child and could have visited it at her pleasure. She testified also that the child could have been placed in a boarding home and the mother would not be required to pay for its maintenance if she was not working. The fact is that the mother went to work two months after the baby was born. Notwithstanding these alternatives she preferred another course.

She continued in the attitude of abandonment for a long period after the birth of the child and did not change her position until her parents inadvertently learned the facts of the case. She furnished data necessary to the preparation of the petition in adoption to an attorney in New York City representing appellants. The New York attorney testified as follows:

"A. Miss M. came to my office and told me that the papers I had sent up which were the adoption agreement and the petition had been delivered to her mother by mistake and her mother had read the papers and in that way found out about the child and her mother insisted she take the child. She said she would prefer not to have it, but for that reason she would take it and if we could produce a death certificate of the death

of the child she would be willing to go back to her mother and tell her mother the child was dead and then we could proceed with the adoption papers."

Respondent denied this latter statement but admitted, "I said I wished the child was dead."

Notwithstanding the certainty of inference to be drawn from the foregoing, we have confirmation of abandonment out of her own mouth. On December 16th, 1939, she wrote the New York attorney with reference to the adoption proceedings as follows:

"It would be impossible for me to go to New York at present as this would necessitate losing my position here and the minimum time in which I can reach New York from here is 15 hours. Since I only have one afternoon off a week and never a whole day you can understand my position.

I am very anxious to comply with your needs. Would it be possible to do so by mail? If not can the matter be held over until such time as I can reach New York?"

Questioned as to her statement that she was very anxious to comply with the needs of the attorney she responded "I didn't want him to know I had changed my mind because I was afraid of the baby being moved." On cross-examination she explained further:

"Q. In other words you were leading these people to believe this child was going out for adoption but in the back of your mind you had no such thought? A. That is right.

"Q. So that really you were misrepresenting the facts to these people, weren't you? A. Well, probably I was."

On direct examination respondent testified that, as she was leaving the hospital, she said to Dr. C.: "Well, Dr. C. you know the law is at the end of six months the mother has the right not to sign the papers, and if I don't want to it give[s] me a trial period just the same as the foster parents." This statement is so completely at variance with her every other act in the matter that it is to be disregarded as sheer afterthought. A person so bereft of consideration for the child that she did not ask to see it or to hold it immediately at birth and who did not evidence any concern as to the dis-

position of the child and who stated some time later that she wished the child was dead, is certainly not a person who would so preserve her legal right to future custody of the child nor even to have a mental reservation concerning it.

It seems therefore that this mother, prior to the birth of her child, engaged through Dr. C. to abandon the child to some suitable person; that she did knowingly permit the child to be taken from the hospital to that person even prior to the time that she herself left the hospital; that she made no effort until after her parents learned of the fact to see or care for the child; that she did not avail herself of the several opportunities, including bastardy proceedings against the putative father, to keep the child and to care for it and that she was entirely satisfied with the arrangement made. Upon her parents learning of the situation she changed her mind and now seeks to disestablish the status which she herself created. The foster parents who acted upon the abandonment have had the child and nurtured it since it was taken from the hospital. They appear to be responsible people and well qualified to maintain and rear the child. This mother should not now be permitted to revoke her act of abandonment and take the child from its accustomed surroundings.

Our law is clear on the subject. It is not the parental right but the interest of the child which is controlling. *Richards* v. *Collins, 45 N. J. Eq. 283, 287.*

By statute a child is abandoned where it is willfully forsaken. *R. S. 9:6-1.* This child was willfully forsaken while yet in the mother's womb.

In *Winans* v. *Luppie, 47 N. J. Eq. 302,* (bottom *p. 304*), this court said: "The statutory notion of abandonment does not necessarily, we think, imply that the parent has deserted the child, or even ceased to feel any concern for its interests. It fairly may, and in our judgment does, import any conduct on the part of the parent which evidences a settled purpose to forego all parental duties and relinquish all parental claims to the child. Such a purpose, clearly manifested, certainly forms a more reasonable ground for permitting judicial discretion to decide whether another may assume these claims

and duties, than does the signature of the parent, which a mere impulse may induce. It does not follow that the purpose may not be repented of, and in proper cases all parental rights again acquired, including this statutory right of preventing adoption by withholding consent; but, when once the abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child. When, in pursuance perhaps of the abandonment, new ties have been formed and a new station in life has been taken by the child, it might be unjust, that, solely because of the parent's caprice, legal sanction should be refused to the new conditions. Under such circumstances, a court might lawfully deem the abandonment irrevocable, so far as the claims of the parent were concerned." See, also, *Wood* v. *Wood, 77 N. J. Eq. 593* (bottom *p. 597*). The case of *Hesselman* v. *Haas, 71 N. J. Eq. 689,* expresses no contrary view.

To unsettle the child's present attachments and bring it into family life with other children of as many different paternities, however well disposed the husband of respondent may be, would be detrimental to the best interests of the child. To contend otherwise is to mock reason and experience.

We determine that respondent did in fact abandon this child and may not now reassert her right to custody.

The decree appealed from is reversed.

*For affirmance*—THE CHIEF-JUSTICE, HEHER, PERSKIE, PORTER, COLIE, JJ. 5.

*For reversal*—PARKER, CASE, BODINE, DONGES, DEAR, WELLS, RAFFERTY, HAGUE, THOMPSON, JJ. 9.