793 A.2d 760

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. N.I., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted December 3, 2001—Decided March 14, 2002.

Before Judges HAVEY, COBURN, and WEISSBARD.

*Peter A. Garcia*, Acting Public Defender, attorney for appellant (*M. Virginia Barta*, Assistant Deputy Public Defender, of counsel and on the brief).

*John J. Farmer, Jr.*, Attorney General, attorney for respondent (*Linda K. Danielson*, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

WEISSBARD, J.A.D.

In this criminal appeal we must determine the meaning of the words "willfully forsaking," found in part of the definition of

abandonment in *N.J.S.A.* 9:6–1 which is, in turn, incorporated into second degree endangering welfare of children, *N.J.S.A.* 2C:24–4. We conclude that the statute requires an intent to permanently abandon the child. Because the trial judge did not define the critical term for the jury, we reverse defendant's endangering conviction. We do, however, affirm his conviction for third-degree theft.

Defendant, N.I., appeals from his conviction, after a three-day jury trial, of third degree theft, in violation of *N.J.S.A.* 2C:20–3a (count one) and second degree endangering the welfare of a child, in violation of *N.J.S.A.* 2C:24–4a (count two). After denial of his post-trial motion for a judgment of acquittal pursuant to *R.* 3:18–2, or a new trial pursuant to *R.* 3:20–1, defendant was sentenced to a five-year state prison term on count one and ten years with four years of parole ineligibility on count two, the terms to run concurrent. Appropriate penalties were also imposed.

On January 31, 1998, defendant was observed in the Stern's Department Store in the Bergen Mall in Paramus taking items of children's clothing and putting them into a bag which was then placed under a blanket resting on the hood of a stroller. Defendant had been seen initially by a salesperson who reported the incident to a store security officer, Ron Botelho, who also made observations. As defendant left the store accompanied by a child, Botelho followed him outside into the parking lot. Botelho identified himself and asked defendant to return to the store to discuss the clothing he had taken. Defendant ignored Botelho and kept walking, pushing the stroller and gradually increasing his pace. At some point, defendant began to run across the parking lot, toward Route 4. As he fled, a large bag fell out of the stroller and the child, who was running with defendant, tripped over the bag and fell. Botelho stopped to assist the child and radioed another security officer, Bochner, of defendant's flight. Bochner gave chase but defendant escaped.

Police responded and learned from the child that her name was K. and that defendant, her father, was N.I. K. was five years old.

She was taken to police headquarters but no one came or called to inquire about her.

Botelho subsequently examined the bag which had fallen from the stroller. Inside the bag was a "booster bag," a container lined with foil and plastic, commonly used by shoplifters to prevent merchandise security tags from setting off an alarm. Inside the booster bag were twenty-three articles of children's and infants' clothing with retail price tags totaling $638.

On the evening of January 31, Detective Joseph Ackerman took over the investigation. He observed that K. had no injuries and appeared to be healthy and happy. Ackerman learned that the Hackensack Police Department had a photo of defendant and sent Detective Benkey to pick it up. Benkey thereafter returned from Hackensack not only with the picture but with C.I., K.'s uncle, who had been sent to Hackensack to pick up the child on the mistaken assumption that she was there, arriving at about 10:00 p.m. K. was, understandably, happy to see her uncle.

Defendant's niece, K.W., testified in his defense at trial to the following. On January 31 K.W. accompanied defendant, his girlfriend G.S., and defendant's two children, B. and K., from their homes in the Bronx to go shopping at Stern's. K.W. went off on her own after arriving at the store. At 6:30 p.m. she exited Stern's and heard G.S. screaming. Defendant was sprawled on the pavement and K. was standing a short distance away. An unidentified man came up, obviously angry, and "snatched" K. When the two women followed him to the door of the store, the man pulled out a badge and told them to "pick the baby up at the precinct." After recovering from their shock, K.W. and G.S. went over to defendant, who was on the ground next to the tipped-over stroller holding B. close to his chest. K.W. telephoned her grandmother in the Bronx to tell her what had happened after which she, G.S., defendant, and the child sat in their van for over an hour until her uncle, C.I., arrived with K., after which they returned to the Bronx, arriving home after midnight.

The verdict made it clear that the jury rejected K.W.'s version of the events of January 31, 1998 and generally accepted the scenario proffered by the State.

On appeal, defendant raises the following issues:

POINT I. DEFENDANT IS ENTITLED TO JUDGMENT OF ACQUITTAL FOR ENDANGERING THE WELFARE OF A CHILD BECAUSE THERE WAS INSUFFICIENT EVIDENCE THAT DEFENDANT ABANDONED HIS DAUGHTER. ALSO, THE COURT DID NOT CHARGE THE JURY IN ACCORDANCE WITH THE STATUTE AND FAILED TO DEFINE ABANDONMENT, FORSAKING AND WILLFULLY. (Partially Raised Below)

POINT II. THE ADMISSION OF TESTIMONY THAT THE HACKENSACK POLICE HAD A PHOTOGRAPH OF DEFENDANT, A RESIDENT OF NEW YORK CITY, DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL.

POINT III. DEFENDANT'S SENTENCE IS NOT IN ACCORD WITH THE SENTENCING GUIDE-LINES; CONSEQUENTLY, IT MUST BE REDUCED.

POINT IV. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR TRANSFER TO A DRUG TREATMENT PROGRAM.

Defendant raises additional issues in a supplemental *pro se* brief, entitled "Petition for Certification," but without clear point headings. We have also considered those issues. Because we find that the endangering charge failed to define an essential term for the jury, we reverse defendant's conviction on count two. We affirm the conviction on count one.

## I.

Under a single point heading, defendant attacks both the sufficiency of the evidence and the adequacy of the charge.[1] We begin with the challenge to the jury instructions.

*N.J.S.A.* 2C:24–4a provides, in pertinent part, that:

Any person having a legal duty for the care of a child ... who causes the child harm that would make the child an abused or neglected child as defined in R.S. 9:6–1, R.S. 9:6–3 and P.L.1974, c. 119, § 1 (C. 9:6–8.21) is guilty of a crime of the second degree.

---

[1] Defendant's brief violates *R.* 2:6–2(a)(5) which requires that each legal issue be addressed separately "under appropriate point headings."

The statute was intended to incorporate into the criminal code the fourth degree crime defined in *N.J.S.A.* 9:6–3 "without substantial change except for the penalty provisions." *Final Report of the New Jersey Criminal Law Revision Commission,* Vol. II at 259 (1971) (Final Report). Thus, the Commission incorporated "by reference the definitions of 'abused' 'abandonment,' 'cruelty' and 'neglect' contained in *N.J.S.A.* 9:6–1, which also are incorporated into *N.J.S.A.* 9:6–3." *State v. Demarest,* 252 *N.J.Super.* 323, 328, 599 *A.*2d 937 (App.Div.1991). As was further explained:

> After the Criminal Law Revision Commission issued its report but before the Legislature enacted the Code, the scope of civil remedies for child abuse and neglect were expanded by the enactment of chapter 119 of the Laws of 1974, *N.J.S.A.* 9:6–8.21 to 8.73, and further extended by amendments to this legislation enacted as Chapter 209 of the Laws of 1977. The final form of the offense of endangering the welfare of a child contained in the Code as enacted in 1979 incorporates by reference the definitions of "abused" and "neglected" child in both *N.J.S.A.* 9:6–1 and *N.J.S.A.* 9:6–8.21.
>
> [*Id.* at 328–29, 599 *A.*2d 937.]

Although *N.J.S.A.* 9:6–3 is the source statute for *N.J.S.A.* 2C:24–4a, it does not contain any definitions of an "abused" or "neglected" child. *State v. Demarest, supra,* 252 *N.J.Super.* at 329 n. 3, 599 *A.*2d 937. Those definitions are found in *N.J.S.A.* 9:6–1, as well as in *N.J.S.A.* 9:6–8.21. In this case the State contended that K. was abandoned.

*N.J.S.A.* 9:6–1 provides, in pertinent part, that:

> Abandonment of a child shall consist in any of the following acts by anyone having the custody or control of the child: (a) willfully forsaking a child; (b) failing to care for and keep the control and custody of a child so that the child shall be exposed to physical or moral risk without proper and sufficient protection; (c) failing to care for and keep the control and custody of a child so that the child shall be liable to be supported and maintained at the expense of the public, or by child caring societies or private persons not legally chargeable with its or their care, custody and control.

The section does not provide any definition of "willfully forsaking." In a similar vein, *N.J.S.A.* 9:6–8.21 defines an "abused or neglected" child to mean, among other things, "a child who has been willfully abandoned by his parent...." That section contains no definition of abandonment.

In accordance with these provisions, the trial court charged the jury as follows:

> Abandonment of a child will consist in any of the following acts by anyone having the custody or control of the child; one, willfully forsaking the child; two, failing to care for and keep the control or custody of the child so that the child will be exposed to physical risk without proper and sufficient protection. Abused or neglected child means a child less than 18 years of age whose parent or guardian has willfully abandoned the child.

The court did not attempt to define the term "willfully forsaking." The court further instructed the jury that the applicable mental state for the offense was "knowingly." *See State v. Demarest, supra.* The court's charge followed the Model Charge which, in a footnote, merely directs trial judges to charge "the appropriate definition of an abused or neglected child as provided in *N.J.S.A.* 9:6–1 and *N.J.S.A.* 9:6–8.21 as indicated by the facts of the case." *Model Jury Charge* (Criminal) *N.J.S.A.* 2C:24–4a (Approved May 21, 1993). There were no objections to the charge.

During deliberations the jury requested that the definition of abandonment be provided to them and, with consent of counsel, the court sent a reply to the jury stating:

> Abused or neglected child means a child less than 18 years of age that has been willfully abandoned by a parent or guardian. Abandonment of a child can consist of any of the following acts: A, willfully forsaking the child, and or B, failing to keep or control so that the child shall be exposed to physical risk without proper and sufficient protection.

Although defendant filed a post-trial motion seeking a judgment of acquittal or a new trial on the endangering charge, no complaint was raised concerning the jury instructions.

Defendant now contends that the instructions were deficient in failing to define the terms "abandonment," "forsaking," and "willfully." As we have noted, *N.J.S.A.* 9:6–8.21 simply speaks of a child who has been "willfully abandoned," while *N.J.S.A.* 9:6–1 provides that one of the means of abandonment is "willfully forsaking a child."

Contrary to defendant's argument, the Legislature did provide a definition of abandonment in *N.J.S.A.* 9:6–1, by stating that it "shall consist in any of" three specific actions, one of which is

"willfully forsaking a child." Thus, there is no problem in the definition of abandonment; rather, the deficiency, if any, is that the charge in this case provided no guidance to the jury on the meaning of the essential terms, "willfully" or "forsaking."

It is, of course, settled that clear and correct jury instructions are essential to a fair trial. *State v. Cooper,* 151 *N.J.* 326, 363, 700 *A.*2d 306 (1997), *cert. denied,* 528 *U.S.* 1084, 120 *S.Ct.* 809, 145 *L.Ed.*2d 681 (2000). "A charge is a road map to guide the jury and without an appropriate charge a jury can take a wrong turn in its deliberations." *State v. Martin,* 119 *N.J.* 2, 15, 573 *A.*2d 1359 (1990). In *State v. Alexander,* 136 *N.J.* 563, 571, 643 *A.*2d 996 (1994), the Court said:

> A court's obligation properly to instruct and to guide a jury includes the duty to clarify statutory language that prescribes the elements of a crime when clarification is essential to ensure that the jury will fully understand and actually find those elements in determining the defendant's guilt.

The obligation to define critical terms follows from the fundamental proposition that " '[t]he criminal law cannot be administered justly or efficiently if the jury is allowed to speculate as to what conduct the law intended to proscribe by a specified crime.' " *Id.* at 572, 643 *A.*2d 996 (quoting *State v. Butler,* 27 *N.J.* 560, 595, 143 *A.*2d 530 (1958)). This requirement applies "even when statutory terms have common or well-understood meanings based on ordinary experience." *Ibid.* Indeed, "statutes containing words whose meanings are ordinary and understandable often require a judicial determination with respect to their intended scope of application." *Id.* at 573, 643 *A.*2d 996.

This is not to say that every word used in a charge must be further defined even when it has a readily and commonly understood meaning. *See State v. Rovito,* 99 *N.J.* 581, 584–85, 494 *A.*2d 309 (1985) (terms such as "offer," "transfer," or "otherwise transfer possession," as used in definition of "to dispose of" in *N.J.S.A.* 2C:39–1d, need no further definition for the jury). Certain words can be understood by "a person of average intelligence" and "would not send the average citizen scrambling for a dictionary."

*State v. Afanador,* 134 *N.J.* 162, 171, 631 *A.*2d 946 (1993) ("organizer, supervisor, financier or manager . . . carry their ordinary and well understood meanings"). Words "used by ordinary citizens in everyday conversation" need not be defined. *Id.* at 175, 631 *A.*2d 946. In this case, as we have pointed out, the critical words used in the alternative form of abandonment, such as "care for . . . control . . . custody . . . physical risk . . . sufficient protection," do not appear to be " 'beyond the ken of the average juror,' " *State v. Hackett,* 166 *N.J.* 66, 83, 764 *A.*2d 421 (2001), and would not require further clarification. *See State v. T.C.,* 347 *N.J.Super.* 219, 242, 789 *A.*2d 173 (App.Div.2002).

However, the same cannot be said of "willfully" and "forsaking," as the facts of this case make clear. Defendant unquestionably left his child in the mall parking lot and ran away. However, it is arguable that he thereafter provided information concerning her whereabouts to a relative who then went to the police station, albeit the wrong one, to retrieve the child that same day. While defendant's niece testified that she called her grandmother in New York to relate K.'s whereabouts, her testimony also was that defendant was with her when the call was made. Indeed, she testified that she, defendant, G.S., and defendant's other child, B., all remained in the van in the mall parking lot until defendant's brother later arrived with K. Given these facts, whether defendant could be said to have forsaken the child depends on whether the term requires a permanent relinquishment, which a jury might have found absent here, or whether forsaking can be satisfied by the type of temporary leaving, which the jury might also have found on these facts.

■ One dictionary defines forsake as "1: To renounce (as something once cherished) without intent to recover or resume . . . 2: to quit or leave entirely: withdraw from . . ." *Webster's Ninth New Collegiate Dictionary* 486 (1983), while another defines it as "1. to give up, to renounce . . . 2. to withdraw one's help or friendship or companionship from . . ." *Oxford American Dictionary* 343 (Paperback ed.1982), and yet another as "1. to quit or

leave entirely; abandon; desert; 2. to give up or renounce (a habit or way of life, etc.)". *The Random House Dictionary of the English Language, Second Edition Unabridged* 753 (1987). The definitional weight clearly suggests permanent relinquishment.[2] Indeed, every dictionary makes clear that forsake is synonymous with abandonment. The definitions of abandonment, in turn, also refer to relinquishment with the intent of never again claiming an interest in the thing abandoned. *See Black's Law Dictionary* 1 (7th ed.1999); *Webster's, supra,* at 43; *Random House Dictionary, supra,* at 2. With respect to abandonment in the family law context, the dictionaries define the act as that of "leaving a spouse or child willfully and without an intent to return." *Black's, supra,* at 2.

While dictionary definitions may be employed to define imprecise terms,[3] a simple canvassing of dictionaries does not provide a definitive answer unless we are first able to determine the sense in which the Legislature used the term. *State v. Alexander, supra,* 136 *N.J.* at 574, 643 *A.2d* 996. In the case of this statute, not only does the history fail to suggest that answer, but even the Criminal Law Revision Commission thought the terms potentially too imprecise for criminal prosecution. In proposing what is now *N.J.S.A.* 2C:24–4a, the Commission expressed the following misgiving:

> We are not happy with the breadth of, nor the precision of the definitions of, abuse, abandonment, cruelty and neglect in N.J.S. 9:6–1. The conduct which is appropriately prevented by non-criminal sanctions needs not always also be made criminal. Further, provisions of Chapter 6 of Title 9 show the basic thrust of it not to be to provide a criminal sanction but rather a strong remedy to compel support and/or proper conduct toward the child. Pending a reexamination of those

---

[2] The common marriage vows' use of the term "forsaking all others," certainly suggests a permanent, rather than temporary, commitment. Most participants would undoubtedly be shocked to find that the use of forsaking in that context meant anything less.

[3] *See State v. Kittrell,* 145 *N.J.* 112, 122, 678 *A.2d* 209 (1996); *State v. Wright,* 96 *N.J.* 170, 172–73, 475 *A.2d* 38 (1984); *State v. Allen,* 334 *N.J.Super.* 133, 139, 756 *A.2d* 1087 (Law Div.2000).

> definitions for civil purposes, we do not believe we should tamper with them for criminal purposes which might destroy the most effective sanction to stop the misconduct. We do believe that reconsideration of this entire field of law would be appropriate. With hesitancy, then, we simply recommend continuation of existing law.
>
> [*Final Report, supra*, at 260.]

The leading commentator on the Code has likewise noted that the "Title 9 citations in [*N.J.S.A.* 2C:24–4a] do not provide a clear definition of the sort of harm forbidden." Cannel, *New Jersey Criminal Code Annotated*, comment 3 on *N.J.S.A.* 2C:24–4 (2000).

Only a few cases have addressed the "willfully forsaking" concept. In *In re A.B.M.*, 132 *N.J. Eq.* 434, 28 *A.*2d 518 (E. & A.1942), the Court found that a mother, who made arrangements for her unborn child to be immediately placed for adoption and who never contacted or even saw the child after its birth, had abandoned the child. Referring to the statutory definition of abandonment in *N.J.S.A.* 9:6–1, the Court said that the child had been "willfully forsaken while yet in the mother's womb." *Id.* at 441, 28 *A.*2d 518. The Court went on to quote with approval from *Winans v. Luppie*, 47 *N.J.Eq.* 302, 305, 20 *A.* 969 (E. & A. 1890), that abandonment "import[s] any conduct on the part of the parent, which evidences a settled purpose to forego all parental duties, and relinquish all parental claims to the child." In *State v. Sanders*, 230 *N.J.Super.* 233, 553 *A.*2d 354 (App.Div.1989), we addressed the sufficiency of the factual basis supporting defendant's plea of guilty to a violation of *N.J.S.A.* 2C:24–4a. We found that the action of the defendant, who had left her two-day-old baby in a bus station restroom in Philadelphia and boarded a bus from Atlantic City with the express purpose of leaving the child forever was sufficient, as constituting the "ultimate act" of neglect under the statute. *Id.* at 235, 237, 553 *A.*2d 354. The defect addressed in this case was apparently not raised, and therefore not addressed, in *Sanders*.

The alternative definitions of abandonment in *N.J.S.A.* 9:6–1 also tend to support our view. Both of the other definitions proscribe "failing to care for and keep the control and custody of a

child" so that the child shall be exposed to harm, subsection (b), or shall become a financial burden upon the public or others not chargeable with the child's care, subsection (c). Both of those alternatives do not require a permanent relinquishment and do not use the word forsaken which is employed, in stark contrast, only in subsection (a). We believe the Legislature was thereby drawing a line between harms, physical, moral, or financial, that might befall the child or others from even a temporary leaving, and the "ultimate act" of neglect described by "willfully forsaking."

We conclude that the word "forsaking," undefined in the statute, requires definition in order to guide a jury. We conclude further that based on the most common understanding, as well as the scant case law, "forsaking" must be understood as a permanent giving up or relinquishment of the child. We believe that such a definition comports most closely with the probable legislative intent. *See Burns v. Belafsky,* 166 *N.J.* 466, 473, 766 *A.*2d 1095 (2001) (court's role in interpreting a statute is to determine the Legislature's intent as if it had addressed the issue).

We must also consider the meaning of the word willfully used in conjunction with forsaking. The word appears in two places: under *N.J.S.A.* 9:6–8.21, the child must be "willfully abandoned," and under *N.J.S.A.* 9:6–1, "willfully forsaking a child" is one of the definitions of abandonment. In *State v. Burden,* 126 *N.J.Super.* 424, 425, 315 *A.*2d 43 (App.Div.), *certif. denied,* 65 *N.J.* 282, 321 *A.*2d 243 (1974), a pre-code case, defendant was convicted of willfully failing to provide her three small children with proper and sufficient food, clothing, maintenance, and medical attention in violation of *N.J.S.A.* 9:6–1 and 9:6–3. On appeal, defendant argued that "willfully" required "proof of an evil intent and knowledge on the part of defendant that harm would result from her action." *Ibid.* We disagreed, finding that "evil intent or bad motive is not required to prove child neglect [under the statutes]. The word 'willfully' in the context of this statute means intentionally or purposely *as distinguished from inadvertently or acciden-*

tally." *Id.* at 427, 315 *A.*2d 43 (emphasis added); *see also State v. Hofford,* 169 *N.J.Super.* 377, 384, 404 *A.*2d 1231 (App.Div.1979).

Applying that definition in this case, the proofs certainly do not suggest that defendant left his child "inadvertently or accidentally." *State v. Burden, supra,* 126 *N.J.Super.* at 427, 315 *A.*2d 43. The difficulty is, however, that if the *Burden* definition were carried forward into the Code offense, the trial judge would have been obliged to charge "purposely" as the applicable mental state, which requires a "conscious object to engage in conduct of that nature or to cause such a result." *N.J.S.A.* 2C:2–2b(1). However, *State v. Demarest, supra,* 252 *N.J.Super.* at 334, 599 *A.*2d 937, held that "knowing" is the appropriate mental state for the offense charged here.

"Knowing" is a less onerous burden than "purposely" because it only requires awareness of what one is doing rather than it being the actor's "conscious object" to engage in prohibited conduct. Thus, we have the potentially untenable situation of a knowing offense subsuming conduct which is purposeful. Accordingly, defendant argues that *State v. Demarest* was "wrongly decided to the extent that it authorizes a lesser culpability level than that spelled out in Title 9." In that regard, defendant points to the anomalous result that a civil action for abandonment under Title 9 would require a higher degree of culpability than a second degree criminal prosecution with exposure, as here, to ten years in prison.

We do not believe that "willfully," as used in Title 9, was intended to describe the applicable mental state for criminal conviction. Under pre-Code law, mental elements for crimes were "set forth by the use of terms such as 'unlawfully,' 'maliciously,' 'intentionally' and the meaning appropriate for the particular crime [was] left to the judiciary." *Final Report, supra,* Vol. II at 40.[4] For example, in *State v. Burden, supra,* 126 *N.J.Super.* at

---

[4] In *State v. Gleitsmann,* 62 *N.J.Super.* 15, 20, 161 *A.*2d 747 (App.Div.), *certif. denied,* 33 *N.J.* 386, 164 *A.*2d 849 (1960), a prosecution for misconduct in office, we noted that willfulness is "a term which may have different meanings in

427, 315 A.2d 43, the court equated willfully with "intentionally or purposely as distinguished from inadvertently or accidentally." Obviously the court was not using the word "purposely" in the sense that it is now defined in the Code. *N.J.S.A.* 2C:2–2b(1).

■ The fact that willfully is used in some of the subsections defining abuse, abandonment, and cruelty in *N.J.S.A.* 9:6–1, but not in others, and similarly in only some parts of the definition of "abused or neglected child" in *N.J.S.A.* 9:6–8.21, and not at all in *N.J.S.A.* 9:6–3, which actually sets forth the criminal offense, leads us to conclude that "willfully" as used in "willfully forsaking" does not set forth a culpable mental state and is, therefore, not in conflict with the knowing culpability requirement for *N.J.S.A.* 2C:24–4 established by *State v. Demarest.* Thus, the potentially untenable situation alluded to earlier, of having a knowing offense subsume a purposeful offense, would not exist. *State v. Demarest, supra,* 252 *N.J.Super.* at 333, 599 *A.2d* 937; *cf. State v. Mendez,* 345 *N.J.Super.* 498, 504–11, 785 *A.2d* 945 (App.Div.2001).

Having said this much, the fact remains that willful, even if used in the lay sense, does describe a type of mind-set and is not so well understood that the jury can be left without a definition. Returning to the dictionaries, the *Oxford American Dictionary, supra,* at 1068, defines willful as "1. done with deliberate intention and not as an accident, *willful murder.* 2. self-willed, obstinate, *a willful child.*" We believe that the emphasis should be on the absence of inadvertent or accidental conduct as the *Burden* court held. However, that state of mind is already sufficiently de-scribed by "knowingly." *N.J.S.A.* 2C:2–2b(2). As a result, willful

---

different contexts." In that case we said that it connoted " 'an evil purpose or mental culpability,' a concept which is often labeled 'criminal intent,' 'guilty knowledge,' 'mens rea,' 'bad purpose,' or corruption.' " *Ibid.* (citing *State v. Williamson,* 54 *N.J.Super.* 170, 182–85, 148 *A.2d* 610 (App.Div.), *aff'd,* 31 *N.J.* 16, 155 *A.2d* 7 (1959)). As used at common law, willful generally refers "to a volitional act ... [a] voluntary act ... in which the individual has the ability to choose his course of conduct." *United States v. Loera,* 923 *F.2d* 725, 728 (9th Cir.1991).

becomes essentially superfluous. The only way to deal with this dilemma, other than judicially excising willful from the statute, is simply to make clear to the jury that the terms knowingly and willfully are generally synonymous in this context.

We also note that the use of willfully to qualify both forsaking in *N.J.S.A.* 9:6–1 and abandoned in *N.J.S.A.* 9:6–8.21 emphasizes the permanency associated with forsaking and further supports our definition of that term as requiring a permanent relinquishment.

Given our conclusion that willfully as used in Title 9 does not refer to a different mental state than knowingly, it is difficult to conceive how the use of the term prejudiced defendant. If there was jury confusion, it could only have been to defendant's benefit.

## II.

Although defendant argued before the trial court that the evidence was insufficient to support his abandonment conviction based on "willfully forsaking," he did not object to the court's charge. We must, therefore, judge his present contention under the plain error standard, which compels reversal only if the error prejudicially affected defendant's substantial rights and is "sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." *State v. Hock,* 54 *N.J.* 526, 538, 257 *A.*2d 699 (1969), *cert. denied,* 399 *U.S.* 930, 90 *S.Ct.* 2254, 26 *L.Ed.*2d 797 (1970); *R.* 2:10–2; *see State v. Bey,* 112 *N.J.* 45, 94–95, 548 *A.*2d 846 (1988). The possibility of an unjust result must be " 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.' " *State v. Jordan,* 147 *N.J.* 409, 422, 688 *A.*2d 97 (1997) (quoting *State v. Macon,* 57 *N.J.* 325, 336, 273 *A.*2d 1 (1971)).

We conclude that if the jury based its guilty verdict on the undefined term "willfully forsaking," a reasonable doubt does exist as to whether the jury was led to a result it might not have otherwise reached. A rational jury, given an appropriate defini-

tion of forsaking, could have concluded, even in the face of defendant's unconscionable behavior, that he did not intend to permanently abandon his child. We cannot forget that "charging errors are usually regarded as poor candidates for rehabilitation by harmless error treatment," *State v. Malloy*, 324 *N.J.Super.* 525, 533, 736 *A.2d* 532 (App.Div.1999) (citing *State v. Vick*, 117 *N.J.* 288, 289, 566 *A.2d* 531 (1989)), and that "[n]o surer showing of a clear capacity to bring about an unjust result can be made than a basic error in instructing the jury." *Ibid.* (citing *State v. Jordan, supra,* 147 *N.J.* at 422–23, 688 *A.2d* 97); *see also State v. Simon,* 79 *N.J.* 191, 206, 398 *A.2d* 861 (1979). It is not without significance that during deliberations the jury asked for a redefinition of abandonment, which resulted in a repeat of the inadequate and erroneous instruction.

Regrettably, in the two decades since the Code was adopted, the Legislature has never acted on the Criminal Law Revision Commission's suggestion for a "reconsideration of this entire field of law...." The imprecision of the Title 9 definitions incorporated into *N.J.S.A.* 2C:24–4a, which caused the Commission to be "not happy" and to recommend adoption of the statute only "[w]ith hesitancy," has come home to roost in this case. It would, of course, be best if *N.J.S.A.* 2C:24–4a was self-contained with its own appropriate and precise definitions. However, we leave that task to the Legislature, if it deems it appropriate to act.[5]

### III.

Defendant also argues that the court's charge was erroneous in that the judge mistakenly instructed the jury that the second aspect of abandonment consisted of "failing to care for and keep

---

[5] As we have explained, the present charge with respect to willfully forsaking is inadequate. We refer the drafting of an appropriate instruction to the Committee on Model Criminal Jury Charges. The charge must make clear to the jury in appropriate language that forsaking requires an intent to permanently relinquish all claims to the child and that willfully signifies an action that is not inadvertent or accidental.

the control *or* custody of the child so that the child shall be exposed to physical risk without proper and sufficient protection," rather than, as the statute reads, "failing to care for and keep the control *and* custody of the child . . . ." (emphasis added). Defendant contends further that the court compounded its error when it purported to repeat the initial charge in response to the jury question but omitted the words "care for."

As noted earlier, because defendant failed to object to the charge, we address his claim under the plain error standard. We conclude that there was no plain error in this aspect of the judge's instruction. We fail to see how the jury could, in light of the evidence, have been misled as a result of the judge stating "custody *or* control" instead of "custody *and* control." In this case, the State's evidence, obviously credited by the jury, was that defendant had both custody and control. As a result, the inadvertent substitution of "or" for "and" could not be said to have made it easier for the State to gain a conviction. Similarly, the court's omission of the words "care for" did not in our view prejudice defendant. As found in the statute, "care for" does not seem to convey anything different from "keep custody and control"; if anything, the expression seems to require less.

IV.

At trial and by way of post-trial motion, defendant did contest the sufficiency of the evidence to support the endangering charge. Given our definition of the term, we conclude that the evidence was insufficient to warrant submission of the case to the jury under a willfully forsaking theory. There is no doubt that arrangements were made within a relatively short period of time for K. to be reunited with her family. Therefore, a rational jury could not have found that the child was willfully forsaken. However, although the evidence of forsaking was insufficient, and indeed not even argued by the State at trial, we conclude that, giving the State the benefit of all favorable inferences, *State v. Reyes,* 50 *N.J.* 454, 459, 236 *A.*2d 385 (1967), the jury could have

found that defendant failed to keep custody or control of K. so that she would not be exposed to physical risk. After she tripped over the stroller or bag and fell to the ground, defendant left her in the parking lot of a busy shopping mall. We do not agree with defendant that "something more than one incident of a failure to watch someone for a short period of time is required." This was not a case of a briefly inattentive babysitter. Thus, while a jury could have acquitted defendant on this aspect of the abandonment definition,[6] the charge was adequate and the evidence supporting the conviction in that regard was sufficient.

## V.

Having found that defendant's conviction could be properly based on the "failing to keep control and custody" prong of the abandonment definition, but not on the "willfully forsaking" prong, we must determine whether his endangerment conviction can stand. In *Stokes v. United States*, 264 *F.* 18, 23 (8th Cir.1920), the court stated:

> A general verdict under an erroneous instruction cannot be upheld, when there were two theories submitted to the jury, on either of which they might have founded it, under one of which the instruction was harmless, while under the other it was error, because the generality of the verdict renders it impossible to determine upon which theory the jury based it. They may have founded it upon the very issue to which the erroneous instruction related, and that instruction may have controlled and produced their finding.

Our research reveals that *Stokes* states the majority view. *See James v. People*, 727 *P.*2d 850, 853–55 (Colo.1986) (collecting cases); *Bloomquist v. State*, 914 *P.*2d 812, 819 (Wyo.1996). Although our courts have not considered the issue in a criminal context, in *Maccia v. Tynes*, 39 *N.J.Super.* 1, 10, 120 *A.*2d 263

---

[6] A jury could have concluded that by leaving K. behind, knowing that he was being pursued by a security guard and knowing, if any part of the defense evidence was accepted, that family members were nearby in a parked vehicle, defendant did not expose her to "physical risk." Even though the guard had no legal duty of care for the child, defendant might have reasonably assumed that she would be protected by him or that he would immediately see to her care.

(App.Div.1956), we held that in a civil case "where two issues are left to a jury, either of which may be determinative of the case, and a general verdict is brought in, making it impossible to ascertain upon which of the issues the verdict was founded ... there must be a reversal even if the error infects only one of the issues." We found this to be the more equitable result. *Id.* at 11–12, 120 *A.*2d 263; *see Gordon v. Noel,* 356 *N.W.*2d 559, 565 (Iowa 1984).

Accordingly, we hold that where a criminal charge is submitted to a jury on alternate theories, and a legal or evidentiary deficiency renders one of the theories without support, a general verdict that does not identify which theory the jury relied upon must be reversed. Without the definition we have provided, the jury could have convicted defendant of endangerment on a theory that he abandoned K. by forsaking her, but not in failing to keep custody and control so as to expose her to a risk of physical harm. *See supra,* footnote 6. We simply do not know. While this might have been an apt case for submission of post-verdict interrogatories, *R.* 3:19–1(b); *see State v. Diaz,* 144 *N.J.* 628, 642–45, 677 *A.*2d 1120 (1996); *State v. Hardison,* 99 *N.J.* 379, 391, 492 *A.*2d 1009 (1985); *State v. M.L.,* 253 *N.J.Super.* 13, 26–27, 600 *A.*2d 1211 (App.Div. 1991), certif. den. 127 *N.J.* 560, 606 *A.*2d 371 (1992), that did not occur and defendant's conviction on count two must be set aside.

## VI.

We have reviewed defendant's other claims of error, including those advanced in his supplemental *pro se* "Petition," and find them without merit. *R.* 2:11–3(e)(2). We add only the following comment.

Defendant contends that the court erred in denying his post-sentencing, *pro se* motion for transfer to a drug treatment program pursuant to *R.* 3:21–10(b). The State concedes that the trial judge apparently did not realize that even second degree offenders faced with a presumption of incarceration are eligible for a drug treatment program under *N.J.S.A.* 2C:35–14, if the prosecutor

consents; if the prosecutor does not consent, the court may order a defendant admitted to a treatment program if the judge finds the prosecutor's objection to be "a gross and patent abuse of prosecutorial discretion." *N.J.S.A.* 2C:35–14c. Although we agree with the State that defendant does not appear to meet all of the necessary criteria established by *N.J.S.A.* 2C:35–14c, we believe it would be most appropriate, under these circumstances, for the trial judge to consider the matter in the first instance. Because we reverse defendant's child endangering conviction, we need not address his arguments concerning the court's findings as to aggravating and mitigating factors on that sentence.

Because the error we have identified has no bearing upon defendant's conviction for theft and because he does not challenge his sentence on that charge, we affirm that judgment, subject to defendant's right to seek entry into a drug treatment program as discussed above.

Reversed and remanded for a new trial on count two; affirmed as to the judgment on count one.