# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2641-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

L.B.,

     Defendant-Appellant,

and

D.W.,

     Defendant.

_____

IN THE MATTER OF J.B.,
a minor.

_____

Argued March 22, 2021 – Decided August 17, 2021

Before Judges Messano and Suter.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FN-09-0204-19.

Adrienne Kalosieh, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Adrienne Kalosieh, of counsel and on the briefs).

William Rodriguez, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Sookie Bae, Assistant Attorney General, of counsel; William Rodriguez, on the brief).

Meredith Alexis Pollock, Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Alexis Pollock, on the letter brief).

PER CURIAM

Following a fact-finding hearing, see N.J.S.A. 9:6-8.44, the Family Part judge concluded defendant L.B. had abused or neglected her eleven-year-old son, J.B. (James), in violation of N.J.S.A. 9:6-8.21(c).[1] Approximately nine months later, defendant entered a voluntary identified surrender of her parental rights in favor of James' then-current resource parent, and the next month the judge entered an order terminating this Title 9 litigation.

---

[1] We use initials and pseudonyms pursuant to Rule 1:38-3(d)(12).

Defendant now appeals, raising a single argument. She contends that the Division of Child Protection and Permanency (the Division) did not prove, and the judge erred in finding, that defendant failed to provide the minimum standard of care for James required by N.J.S.A. 9:6-8.21(c)(4), or that she willfully abandoned her son, pursuant to N.J.S.A. 9:6-8.21(c)(5). The Division argues otherwise. Through his Law Guardian, James takes no position on the appeal.[2]

Having considered the arguments in light of the record and applicable legal standards, we affirm the order as modified.

I.

At the hearing, the judge heard the testimony of Division caseworkers Tiffany Meredith and Sandra Cruz-Medrano and considered several Division documents entered into the record. Defendant did not testify or call any witnesses. At the start of the hearing, the parties agreed with the judge that hearsay statements in the documents that were not subject to any exception would not be admitted.

The Division was involved with the family for several years prior to the December 2018 incidents that led to the filing of the verified complaint. At the

---

[2] James' father, defendant D.W., was incarcerated at the time of the hearing, did not appear in the litigation, and is not part of this appeal.

A-2641-19

time of his birth in 2008, James was deemed "medically fragile," subsequently underwent multiple surgeries, and was diagnosed with multiple behavioral and psychiatric problems. After an earlier removal and placement in an inpatient program, the Division returned James to defendant's care in February 2017.

On December 13, 2018, the Jersey City Medical Center (JCMC) contacted the Division after defendant left James at the hospital because she was unable to manage his aggressive and sometimes violent behavior. Defendant wanted the hospital to admit James for inpatient care, but the staff psychiatrist determined admission was unwarranted. Meredith responded to the referral, was able to reach defendant later that evening and convinced her to transport James to Hoboken University Medical Center (HUMC) for a second opinion. That hospital admitted James for monitoring, however, after one week, the staff determined that he was cleared for discharge. Although the Division offered defendant services to cope with James' behaviors, she refused to report to the hospital and take custody of her son, believing it was necessary to place James in an inpatient program for further care. The Division took custody of James at the hospital, placed him in foster care with an unrelated family, and filed its complaint.

A-2641-19

At the fact-finding hearing, Meredith's testimony included an explanation of James' prior residential treatment, his placement in foster care, and his 2017 reunification with defendant. When she was able to contact defendant about the referral from the JCMC, Meredith arranged to meet at defendant's home. She testified that defendant was "very frustrated" and believed "no one was making a proper diagnosis for her son." Defendant described how James had become "aggressive and violent," suffered from "insomnia," and experienced "audio and visual hallucinations about demons." Defendant described an incident in which she awoke to find James holding a knife and threatening to kill her and her other, older son. Defendant stated that for everyone's safety, she was no longer able to care for James.

Meredith testified that she persuaded defendant to seek a second opinion, even though defendant made clear she was specifically trying to secure an inpatient placement for James. Meredith accompanied defendant and James to HUMC for an evaluation. During the long wait to see the doctor, defendant showed Meredith a video recording of the incident that led her to seek help at the Medical Center; in it, James was seen screaming at his mother. Meredith also observed James becoming more "agitated and frustrated" as he waited to be evaluated in Hoboken, and heard the child claim to see demons and converse

5

with invisible beings. Finally, after being assessed, the hospital admitted James to its "children's psychiatric unit."

After a one-week observation period, the hospital staff met to discuss James' recommended treatment on discharge to a partial hospitalization program (PHP). Meredith said defendant reiterated her frustration and belief that doctors continued closing the case and would arrange for continued services, including placement in a PHP program. Defendant agreed to pick up James at the hospital; however, she never did, causing the Division to take custody of James at HUMC and secure a placement for him.

During cross-examination, Meredith testified about defendant's efforts to address James' behavioral and psychiatric problems after reunification. Defendant also said she had developed post-traumatic stress disorder and a heart condition requiring surgery because of the stress of caring for James. Meredith acknowledged observing damage James caused to defendant's apartment, and she acknowledged being sympathetic to defendant's plight and her desire to have James placed in a residential treatment facility. Meredith testified the Division found "the act of neglecting [James] by abandoning him at the hospital was an act of desperation" and confirmed "the child did not suffer any injury or harm as a result of being left in the hospital."

Cruz-Medrano, a permanency supervisor for the Division, worked after hours for its special response team for more than twelve-and-a-half years. She responded to HUMC. Her first contact with defendant was by phone later that evening. Defendant told her that she "would not be able to take her child home due to his behaviors and that she was fearful." Defendant provided no names of relatives who might care for James. Cruz-Medrano spoke with James at the hospital; he told her that "he was just waiting for his mom to come pick him up." Because James was cleared for discharge and defendant had no intention to pick him up, the Division executed an emergency removal. Defendant provided the Division with a "bag of clothes . . . and some . . . Christmas gifts" she had for her son. Cruz-Medrano testified that James admitted he was "unable to control his anger" and confessed to hearing voices. Defendant told Cruz-Medrano that she wanted James to remain hospitalized out of fear, that "home support had failed her," and she did not have a plan for James' return.

After considering the summations of counsel, the judge reserved decision noting the case was not "clear cut."[3] Two days later, the judge issued a written

---

[3] Defendant notes in passing that the judge should have dismissed the Title 9 complaint and proceeded under Title 30 to provide services to the family. She notes her trial counsel made such a request. That is an apparent reference to a single sentence at the close of defense counsel's summation in the Family Part.

decision in support of her order. After detailing the testimony and citing

relevant case law, the judge wrote:

> [T]he record contains substantial, credible evidence to support a finding of neglect under both N.J.S.A. 9:6-8.21(c)(4) and (5). Not only did defendant fail to "exercise a minimum degree of care," she clearly and explicitly refused to care for her child when she willfully refused to take responsibility . . . and to take him home when he was cleared for discharge despite the Division's offer of services and his enrollment in a partial hospitalization program. Defendant believed that this was not sufficient despite it being the recommendation from the hospital . . . . The only plan that she would accept was residential treatment . . . . Not even the hospital recommended residential treatment. At the time of his discharge, [James] was not hearing voices. He believed that his mother was coming to pick him up.
>
> Defendant "abandoned" her son, leaving him alone and forcing the Division to assume care, custody and control of him. . . . A parent is not allowed to abandon a child merely because that child is difficult to control or has mental health issues, since neither circumstance mitigates the fundamental responsibility of the parent to provide care for her child. But for the Division's intervention, defendant left [James] without a safe and secure place to stay, thereby exposing the child to an actual and imminent risk of harm. In essence, defendant "willfully forsook [her] parental

---

Undoubtedly, without any finding of abuse or neglect, the trial court was empowered to proceed under Title 30 and provide services to the family. N.J. Div. of Youth & Fam. Servs v. I.S., 214 N.J. 8, 15 (2013). However, even if counsel's summation comment was a sufficient request, the crux of the issue in this case was defendant's refusal to accept the services proposed by the Division.

A-2641-19

responsibilities."  In re Guardianship of K.L.F., 129 N.J. [32,] 39 [(1992) (second alteration in original)].

II.

Well-known standards guide our review.  "[A]ppellate courts defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a feel of the case that can never be realized by a review of the cold record.'" N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 342–43 (2010) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). Moreover, "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding."  Cesare v. Cesare, 154 N.J. 394, 413 (1998).

However, "[t]here is an exception to th[e] general rule of deference: Where the issue to be decided is an 'alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,' we expand the scope of our review."  N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188–89 (App. Div. 1993)).  When the issue presented turns on a legal conclusion derived from the Family Part's factfinding, "we are not required to defer."  N.J.

Div. of Youth & Fam. Servs. v. A.R., 419 N.J. Super. 538, 542–43 (App. Div. 2011).  This is such a case.

"In general, 'Title 9 controls the adjudication of abuse and neglect cases.'" Dep't of Child. & Fams., Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 177 (2015) (quoting M.C. III, 201 N.J. at 343).  "The focus of Title 9 'is not the "culpability of parental conduct" but rather "the protection of children."'" N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 368 (2017) (quoting E.D.-O., 223 N.J. at 178).  Title 9 defines an "abused or neglected child" as one under the age of eighteen whose

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4).]

"Included under Title 9 is a separate category of abuse or neglect: 'willful abandonment.'  A child less than [eighteen] years of age may be found to be

abused or neglected if the child has been willfully abandoned by his parent or guardian." A.B., 231 N.J. at 368–69 (quoting N.J.S.A. 9:6-8.21(c)(5)).

The "minimum degree of care" element in subsection (c)(4) reflects "the intermediary position between simple negligence and the intentional infliction of harm." Id. at 369 (citing G.S. v. Dep't of Human Servs., 157 N.J. 161, 179 (1999)). After considering the totality of the circumstances and assessing each case on its facts, we must determine whether the parent or guardian "fail[ed] to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 369 (quoting G.S., 157 N.J. at 181).

Here, defendant's decision not to take custody of James at HUMC did not expose the child to the imminent risk of serious injury or harm. There was no medical testimony adduced by the Division that detailed in any way James' then-current psychiatric diagnosis or any evidence of how defendant's failure to provide him with the services the Division intended to supply proved that the child faced "some form of actual or threatened harm," which Title 9 requires. N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 25 (2013). James was in the process of being released from HUMC and certainly faced no imminent risk

11

of harm. Although his future psychiatric treatment hung in the balance, we cannot conclude based on the evidence adduced at the fact-finding hearing that defendant's conduct amounted to abuse or neglect under Title 9. See N.J. Div. of Youth & Fam. Servs. v. S.I., 437 N.J. Super. 142, 154–55 (App. Div. 2014) (holding that although "[a] teenager's . . . thoughts of suicide should never be ignored by adults," the "limited" evidence "fail[ed] to prove the child was in 'imminent danger' or that a 'substantial risk' of harm would result from [the defendant's] refusal to seek immediate psychiatric review, which are prerequisites to sustain a finding of abuse or neglect").

N.J.S.A. 9:6-1 defines abandonment of a child as:

> (a) willfully forsaking a child; (b) failing to care for and keep the control and custody of a child so that the child shall be exposed to physical or moral risk without proper and sufficient protection; (c) failing to care for and keep the control and custody of a child so that the child shall be liable to be supported and maintained at the expense of the public . . . .

In A.B., the Court cited with approval Chief Justice Vanderbilt's formulation of the pre-Title 9 law of abandonment, noting the parent's conduct needed to meet "an extremely high bar" demonstrating "a 'settled purpose' to forego her parental rights." 231 N.J. at 371–72 (citing Lavigne v. Fam. & Child.'s Soc'y, 11 N.J. 473, 480 (1953)); see also, In re Guardianship of DMH, 161 N.J. 365, 377 (1999)

(noting that under Title 30, "abandonment may not be based on parental conduct that is only uncertain, ambivalent or equivocal in fulfilling parental duties." (citing In re Adoption of a Child by D.M.H., 135 N.J. 473, 488, (1994))). In A.B., the Court concluded the evidence failed to establish the defendant "willfully relinquished her parental rights." 231 N.J. at 372.

By citing K.L.F. in her written opinion, the trial judge apparently concluded the evidence here was sufficient to demonstrate defendant "willfully forsook [her] parental responsibilities." 129 N.J. at 39. However, as the Division correctly notes, "[a] trial court judgment that reaches the proper conclusion must be affirmed even if it is based on the wrong reasoning." Hayes v. Delamotte, 231 N.J. 373, 387 (2018) (citing Isko v. Plan. Bd., 51 N.J. 162, 175 (1968)).

Neither N.J.S.A. 9:6-1(b) or (c) require the Division prove that a parent acted willfully or permanently forsook the child. In a different context, we noted the distinction between subsection (a) and these other subsections.

> The alternative definitions of abandonment in N.J.S.A. 9:6-1 also tend to support our view. Both of the other definitions proscribe "failing to care for and keep the control and custody of a child" so that the child shall be exposed to harm, subsection (b), or shall become a financial burden upon the public or others not chargeable with the child's care, subsection (c). Both of those alternatives do not require a permanent

relinquishment and do not use the word forsaken which is employed, in stark contrast, only in subsection (a). We believe the Legislature was thereby drawing a line between harms, physical, moral, or financial, that might befall the child or others from even a temporary leaving, and the "ultimate act" of neglect described by "willfully forsaking."

[State v. N.I., 349 N.J. Super. 299, 311–12 (App. Div. 2002).]

In this case, however well-intentioned defendant's conduct may have been, she willfully refused to accept custody of her son when HUMC was prepared to discharge the child. As a result, the Division, which was prepared to provide services to defendant, including a PHP mental health program, was forced to accept custody and find a placement for James. Defendant produced no medical evidence challenging the hospital's decision that discharge was appropriate. It is beyond serious debate that parents cannot simply refuse to accept custody of their child because their experiences and beliefs lead them to conclude their opinions about what is best for the child are correct, and the opinions of medical providers are wrong. The facts in this case demonstrate the Division proved defendant willfully abandoned James pursuant to N.J.S.A. 9:6-8.21(4)(c)(5).

We affirm the Family Part's order as modified.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

15